9:08 am, Oct 07, 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,      : 14-cr-00095-JFB-ARL-1
                               :
     - versus -                : U.S. Courthouse
                               : Central Islip, New York
                               :
OLENA KALICHENKO,              : August 13, 2019
              Defendant        : 11:09 AM
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

A   P   P   E   A   R   A   N   C   E   S:


**For the Government**:         **Richard P. Donoghue, Esq.**
                                United States Attorney

                        BY:   **Allen Bode, Esq.**
                                Assistant U.S. Attorney
                                100 Federal Plaza
                                Central Islip, NY 11722

**For the Defendant**:          **Murray E. Singer, Esq.**
                                14 Vanderventer Avenue
                                Suite 212
                                Port Washington, NY 11050




**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                laferrara44@gmail.com




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                                    Proceedings

1          THE CLERK:  Criminal Cause for Sentencing in

2   14-cr-95, the United States of America v. Olena

3   Kalichenko.

4          Counsel, please state your appearances for the

5   record.

6          MR. BODE:  Allen Bode for the government, your

7   Honor.  I would also note the presence of Senior United

8   States Probation Officer Lisa Langone.

9          Good morning.

10         THE COURT:  Good morning to both of you.

11         MS. LANGONE:  Good morning, your Honor.

12         MR. SINGER:  For Ms. Kalichenko, Murray Singer.

13         Good morning, your Honor.

14         THE COURT:  Good morning, Mr. Singer.  Ms.

15  Kalichenko is present as well, with the assistance of the

16  Russian interpreter, who will be on standby in the event

17  that Ms. Kalichenko needs some word to be translated.  I

18  would just ask that she raise her right hand for the oath

19  and state her name for the record.

20         THE INTERPRETER:  Nelly Alisaev, Russian

21  interpreter.

22  (INTERPRETER SWORN)

23         THE CLERK:  Thank you.

24         THE COURT:  Okay.  As you know, we've

25  rescheduled this for sentencing.  Are both sides ready to

3

Proceedings

1   proceed?

2          MR. BODE:  We are, your Honor.

3          MR. SINGER:  Yes, your Honor.

4          THE COURT:  I'm just going to review again, I

5   know we did this last time we met, the documentation I

6   have, and I have received some additional documentation

7   which I anticipated including Ms. Kalichenko's pro se

8   objections, which we had talked about at the last

9   conference.  Okay?

10          But before that, we just want to make sure Ms.

11   Kalichenko, you've now had sufficient time to review

12   everything and submit your objections, correct?

13          THE DEFENDANT:  I submitted objections but on

14   this information, this one has been just provided to me.

15   It was the government's response.  I didn't have like

16   (indiscernible), like maybe to I don't know, go through

17   it a little bit more.

18          THE COURT:  Sure, just take -- we'll wait.  Go

19   ahead.  You can take your time.

20   (Pause)

21          THE DEFENDANT:  I think first of all, it should

22   say that I'm not trying to derail the sentence whatsoever

23   at all.  It was not the reason I wanted to raise this

24   issue before the sentencing.

25          THE COURT:  That's --

4

Proceedings

1          THE DEFENDANT:  Second, I wanted the judge to

2    know that I'm actually interested to proceed because

3    there is a way for me to serve my time in my country, so

4    which is in my interest.

5          THE COURT:  Okay.

6          THE DEFENDANT:  So why --

7          THE COURT:  We're going to --

8          THE DEFENDANT:  -- should I be trying to derail

9    any proceeding?

10          THE COURT:  I'm not -- did I say anything about

11   you were trying to delay?  I mean --

12          THE DEFENDANT:  This is the government's point

13   of view.

14          THE COURT:  Okay, but --

15          THE DEFENDANT:  And this is not --

16          THE COURT:  -- I'm the --

17          THE DEFENDANT:  -- derail, it is --

18          THE COURT:  -- judge, right?  I have no

19   concerns --

20          THE DEFENDANT:  Yes.

21          THE COURT:  -- about that . We're ready to

22   proceed today.  You want to proceed today.  But if you

23   need another minute to review Mr. Kabrawala's

24   declaration, I'll let you do that.

25   (Pause)

5

                          Proceedings

1           THE DEFENDANT:  Yes, so they are citing this

2    case.  I read this case also, the Truesdale, so it says

3    where -- it says "Where no agreement exists, the

4    government failure to make a motion can be challenged

5    only if it the defendant makes a substantial threshold

6    showing of an unconstitutional motive such as" and it

7    says what it is, "or lack of a rational relationship to a

8    legitimate government objection."

9           So I wanted, you know, to discuss with my

10   counsel what exactly does it mean, "a substantial

11   threshold showing".  And how can -- how can I proceed

12   with this?

13          THE COURT:  Well, if you want to take -- again,

14   you're skipping ahead.  I just want to give you a chance

15   to review anything that you haven't had a chance to

16   review.  Have you had a chance to review --

17          THE DEFENDANT:  No, I'm just reviewing it right

18   now.

19          THE COURT:  Okay.

20          THE DEFENDANT:  And that's -- I'm asking you

21   questions --

22          THE COURT:  Okay, well let's --

23          THE DEFENDANT:  -- because I'm reading it.

24          THE COURT:  Tell me when you're done reviewing

25   it --

6

Proceedings

1              THE DEFENDANT:  Okay.

2              THE COURT:  -- and then we'll take the next

3    step.

4              THE DEFENDANT:  All right.

5    (Pause)

6              THE DEFENDANT:  How are they saying that they

7    refused to call me at the Fatico hearing as a government

8    witness when they actually did call me?  This is -- I'm

9    not getting it.  How's this the way it is?

10              THE COURT:  Ms. Kalichenko, again we'll discuss

11    whatever you want to discuss about this we'll discuss

12    when you're done.  First read it.  Tell me when you're

13    done reading it.

14              THE DEFENDANT:  Okay.

15    (Pause)

16              THE DEFENDANT:  Yeah, I finished it.

17              THE COURT:  Okay.  So you've had a chance to

18    review it?

19              THE DEFENDANT:  Uh-hum.

20              THE COURT:  Okay.  So let me just go over the

21    documentation and then if you want to add anything on

22    that issue, Ms. Kalichenko, I'll give you a chance to do

23    that.  All right?

24              So I have the presentence report.  I have the

25    recommendation.  I have Mr. LaRusso's submission to the

7

                        Proceedings

1   Department of Justice, the binder, which is October 17,

2   2018, which contains numerous exhibits including the

3   letter from Ms. Kalichenko, her mother, other exhibits,

4   all of which I've reviewed.  Mr. Singer submitted a

5   supplemental sentencing letter on April 15th of 2019.

6           Ms. Kalichenko submitted a pro se letter on

7   July 22nd of this year with respect to an individual from

8   Chili, who was prosecuted in the United States.

9           The government put in its sentencing submission

10  on April 15 of 2019.  The Court obviously has the

11  transcript and heard the testimony from Ms. Kalichenko

12  both at her hearing with respect to the motion to

13  suppress, which was March 17th of 2016.  I have her

14  testimony at the Fatico hearing of Mr. Valerio's

15  sentencing.  That was on July 25th of 2016.

16          And then since our last conference, the -- Ms.

17  Kalichenko, as we had discussed, put in her objections to

18  the recommendation, and a number of arguments made in

19  connection with the recommendation citing cases and other

20  facts that she believes are the relevant considerations

21  for the Court at sentencing.

22          The government responded on August 12th in a

23  letter with respect to this 5k issue, and then just

24  today, I don't think this has been filed on ECF, Mr.

25  Bode?

8

Proceedings

1          MR. BODE:  I think I filed it this morning,

2    Judge.

3          THE CLERK:  It's filed.

4          THE COURT:  Okay.  Mr. Kabrawala put in a

5    declaration, again on this issue about any discussions he

6    had with Mr. LaRusso with respect to his agreement or

7    disagreement with the government not making Ms.

8    Kalichenko a cooperator.

9          Is there anything else I should have in

10   connection with the sentencing from the government?

11         MR. BODE:  Not on behalf of the government,

12   your Honor.

13         THE COURT:  Anything else from the defense?

14         MR. SINGER:  No, Judge.

15         THE COURT:  All right.  So before we proceed,

16   there is this issue regarding Ms. Kalichenko raising her

17   pro se letter, her desire to have a hearing with respect

18   to the government's decision not to sign her up to a

19   cooperation agreement, not to file a 5k letter on her

20   behalf.

21         And at 355, 3553(e) motion that would allow the

22   Court to sentence below the mandatory minimums that

23   otherwise apply.  Okay?

24         So Ms. Kalichenko -- Mr. Singer, I assume

25   there's nothing you want to add on that?  Is there

9

Proceedings

1   anything you want to add on that issue?

2           MR. SINGER:  Judge, this has been an ongoing

3   discussion.  I've certainly, I think expressed my views

4   in the sentencing letter, and I'll reiterate some of that

5   today.

6           THE COURT:  Well again, this is not -- I know

7   you may have some things to say on the sentencing itself.

8   This is just on this of whether or not there should be a

9   hearing about the government's decision not to file a 5k.

10  So that's the only thing I want you to address right now,

11  not the sentencing as a whole.

12          MR. SINGER:  Judge, I guess the bottom line on

13  it is that while I believe that the government's

14  purported rationale for not pursuing cooperation

15  agreement or a filing a 5k1 letter is specious.  The

16  rationale is inconsistent with other prosecutorial

17  decisions made in many other cases by their office.

18          While the decision not to offer any

19  cooperation, Ms. Kalichenko is in our view unconscionable

20  that as a -- as an officer of the Court, as an attorney,

21  I am not aware of a colorable legal claim to -- for a

22  motion to compel.

23          And so I'm in a position where I certainly

24  agree on the merits with Ms. Kalichenko on this, but I

25  don't believe or my own assessment is that there is not a

Proceedings

1  specific claim that I can make as to an unconstitutional

2  motive or the other factors related to the motion to

3  compel, and so I am in a position where I don't believe I

4  can file.

5          THE COURT:  All right.

6          MR. SINGER:  But that's sort of where I end up,

7  and I do so reluctantly because I would like to pursue

8  this because I -- again, our -- we couldn't state our

9  disagreement with the government's decision more

10  strongly.

11          THE COURT:  Okay.  I understand.  Ms.

12  Kalichenko, do you want to add anything on that issue?

13  This is not on the sentencing as a whole, this is just on

14  the issue of whether or not there should be a hearing

15  about the government's decision not to file a motion --

16          THE DEFENDANT:  Your Honor, I would like to ask

17  something because from -- from what I'm reading right

18  now, that's -- doesn't look like -- that doesn't look to

19  me like an accurate, so I never claimed that I entered in

20  a cooperation agreement with -- with the prosecutor.  My

21  claim was that I entered into a cooperation agreement

22  relationship with the Agent Angelini Ankia (ph.), even

23  prior to when there was any kind of an indictment.  This

24  is a  completely different situation.

25          So the first that there was -- the hearing that

11

Proceedings

1   we had was about their immunity promises.  It was not

2   about the existence of the relationship in terms of our

3   cooperation with which -- between me and between the

4   agents -- between the agent that I have totally and

5   entirely fulfilled from my part.

6           So this is different.  They don't even talk

7   about it at all.

8           THE COURT:  Okay.  I understand what you're

9   saying.  I don't believe that that difference that you're

10  discussing warrants a hearing for the following reasons,

11  and obviously we already had a hearing with regard to

12  your interactions with the agent in the Ukraine before

13  you came here.  So I've already heard your testimony

14  regarding that.  I've already heard his testimony

15  regarding that, and I don't believe that a hearing on

16  this issue is warranted.

17          First, with respect to the legal standard, as

18  the government noted, the case cited by Ms. Kalichenko in

19  her papers, the United States v. Doe, 586 F.Appx 58 (2d.

20  Cir. 2014), is not applicable to this type of situation.

21  That's where a defendant who has a cooperation agreement

22  with the government and the government refuses to make a

23  motion on that person's behalf, the Court can then look

24  into whether or not the decision not to comply with the

25  agreement, and file the 5k was done in bad faith or for

12

Proceedings

1  some unconstitutional motive.  That's the general

2  standard.

3         The Court recognizes, as the government notes

4  in its letter, as Ms. Kalichenko is claiming here, that

5  there does not have to be a formal written agreement in

6  order for that issue to exist, and for the Court to have

7  to explore it.  The United States v. Cardenas, C-A-R-D-E-

8  N-A-S, 302 F.Appx 14 (2d. Cir 2008) discusses the fact

9  that an agreement for cooperation need not be formal or

10 in writing.

11        The request to have a hearing on this issue as

12 to explore whether or not Ms. Kalichenko had an informal

13 agreement, a cooperation agreement where the government

14 agreed that she would get some benefit, sentencing

15 benefit, for coming to the United States and testifying,

16 or otherwise cooperating with respect to Mr. Valerio's

17 prosecution, the request for a hearing on that issue is

18 denied for the following reasons.

19        The Court, as I noted has already had a hearing

20 on this issue.  It was in the context of whether or not

21 Ms. Kalichenko was promised immunity prior to her coming

22 to the United States, and her agreeing to cooperate

23 against Mr. Valerio.

24        The Court obviously had that chance to hear

25 that testimony both from the agent, and from Ms.

13

Proceedings

1  Kalichenko to assess their credibility on this issue, and

2  had issued a full opinion with respect to that.  And I

3  concluded, and continue to conclude that she was not

4  promised immunity or anything else in exchange for her

5  coming to the United States to cooperate against the

6  agent.

7          She did not claim at that hearing, and is not

8  even -- I don't think is claiming now that she had any

9  discussion with the agent that if she were to come to the

10 United States, she would get some type of sentencing

11 benefit.  Her testimony was that it was our understanding

12 that she was not going to be prosecuted at all for coming

13 to the United States.

14         So it obviously would make no sense for her to

15 have a discussion with the agent about some type of

16 leniency the government would provide her in the form of

17 sentencing with the Court when there was no discussion,

18 according to her, and according to the agent, who I found

19 to be credible, about anything related to that, none

20 whatsoever.

21         So there is no reason to have the agent come

22 back, and to repeat all of his conversations with Ms.

23 Kalichenko as it relate to what they talked about, the

24 circumstance in her coming to the United States, and to

25 hear her testimony again.  It would be duplicating what

14

Proceedings

1   the Court has already heard, is clear to the Court from

2   that hearing, and from the record, that the government

3   did not -- the agent did not make any promise to her that

4   she would receive any benefit by coming to the United

5   States.  She voluntarily chose to come, and therefore,

6   there is no agreement with the government based upon

7   those conversations with the agent formal or informal

8   that she receive any type of benefit for purposes of a

9   prosecution or for sentencing obviously.

10          To the extent that she also raises this issue

11   about the Fatico hearing, the Court similarly concludes,

12   and it is clear, and obviously the -- I was a central

13   part of that, the government did not ask Ms. Kalichenko

14   to testify at that hearing.  It was the Court who invited

15   Ms. Kalichenko because I was aware of her allegations of

16   Mr. Valerio raping her, and I believe that that was

17   relevant to his sentencing, was going to hear other

18   testimony from another individual regarding that type of

19   conduct to give her the opportunity, if she wished to, to

20   place that before the Court -- her testimony before the

21   Court, so I could consider it, in connection with his

22   sentencing.

23          So the government had nothing to do with that.

24   And, in fact, as noted both in Mr. Kabrawala's

25   declaration, and Mr. Bode's letter, and I went back and

15

Proceedings

1 reviewed her testimony again from that hearing, she was

2 asked specifically by the government because the

3 government didn't want there to be any misunderstanding

4 that somehow she misunderstood that by testifying in that

5 hearing, the government was converting her into a

6 cooperating witness.

7 It was at page 94 of that hearing that she had

8 no agreement with the government to testify, that she had

9 not been promised anything in exchange for her testimony,

10 and she was just testifying and hoped that the Court

11 itself would consider her testimony in connection with

12 what sentence I ultimately gave.

13 So it is clear, absolutely clear from her

14 testimony under oath at the Fatico hearing, that the

15 government made no agreement with her formal, or

16 informal, in connection with her decision to accept the

17 Court's opportunity for her to testify, and Mr. Valerio's

18 sentencing.

19 Finally, on this issue of whether or not there

20 was some disagreement with respect to Mr. Kabrawala and

21 Mr. Bode as to how Ms. Kalichenko's case should be

22 handled, or whether or not she should be the benefit of a

23 -- receive the benefit of some type of agreement with the

24 government -- first of all, Mr. Kabrawala has put in his

25 declaration denying any such conversation but even apart

16

Proceedings

1   from that, this is not something that the Court will need

2   to have a hearing about.

3          This is not even a claim that Mr. Kabrawala

4   promised Ms. Kalichenko anything.  This is just a claim

5   that there was disagreement within the United States

6   Attorney's Office about what the approach should be with

7   Mr. Kalichenko, whatever Mr. Kabrawala's views have --

8   obviously, he's not the decision maker, and he -- we know

9   in this case, not only did Mr. Bode, who is his

10  supervisor, but Mr. Donahue himself, the United States

11  Attorney, made the decision of what Ms. Kalichenko's

12  position would be with respect to whether or not she

13  would receive any ability to go below the mandatory

14  minimums that wre charged and pled to in this case.

15         We spent many months --

16         MR. BODE:  And the Deputy Attorney General

17  also.

18         THE COURT:  Yes.  And that's true.  It also

19  went down to Washington, and the Deputy Attorney General

20  refused to overrule the decision that had bene made by

21  Mr. Donoghue with respect to that.

22         So what Mr. Kabrawala's views are with respect

23  to that are irrelevant for purposes of any type of

24  hearing.  So the motion is denied.

25         Obviously, the Court under the law, can

17

Proceedings

1  consider Ms. Kalichenko's cooperation in connection with

2  what sentence I should impose.  Obviously, I don't have

3  any ability to go below the mandatory miimum but the

4  Court can certainly consider that cooperation in its

5  totality in deciding what her sentence should be, and I

6  intend to do so.  Okay?

7          So I believe that resolves that issue.

8  Obviously, Ms. Kalichenko, I know you object to that.

9  Your objection is obviously part of the record here, and

10  you can raise it on appeal, okay?

11          THE DEFENDANT:  Yeah, I understand.

12          THE COURT:  All right.  So let's proceed now

13  with the sentencing itself.

14          First, I want to see any objections.  Again,

15  this is not -- I'm not talking about the objections to

16  the recommendation.  I'm just -- I'm talking about the

17  factual information contained in the pre-sentence report,

18  as well as the guidelines calculation.  Does the

19  government have any objection to either of those things?

20          MR. BODE:  No, your Honor.

21          THE COURT:  Does the defense have any objection

22  to either of those things, Mr. Singer?

23          MR. SINGER:  Judge, the only concern I would

24  raise be with regard to paragraph 35 of the pre-sentence

25  investigation report.

Proceedings

1        THE COURT:  Hold on one second.  Let me just

2   turn to that.  Okay.  What's the --

3        MR. SINGER:  My concern is whether that

4   four- point enhancement would be applicable ultimately,

5   even if that were to be removed.  The total offense level

6   would still be 45, and the guidelines would be the same.

7   So while I question the requirement of that four-point

8   enhancement under 2(g)(2.1), ultimately it makes no

9   difference in the guidelines itself.

10        THE COURT:  All right.  But let me just make

11   sure I -- and I agree with you, it doesn't make any

12   difference in the guidelines, and won't make a difference

13   in my sentencing itself, but you're not contesting the

14   facts as it relates to the videos, and what occurred on

15   the video.  You're saying even with those facts, that

16   this enhancement should not apply?  Is that --

17        MR. SINGER:  Yes.

18        THE COURT:  Okay.  All right.  Anything else

19   besides that?

20        MR. SINGER:  No, your Honor.

21        THE COURT:  First of all, with respect to that

22   particular -- does the government want to address that

23   particular enhancement?

24        MR. BODE:  If it's immaterial to sentence, I'll

25   leave the issue but I will note that I think there was a

Proceedings

1    Circuit decision on this in the past two weeks or so, on

2    a related issue of the mental anguish.  I don't know that

3    that would apply in a toddler case, but I now this has

4    been recently addressed in the Circuit.

5              THE COURT:  Okay.

6              MR. BODE:  Oh, and probation is telling me in

7    this case it was a toothbrush and a toy.  So we think

8    factually, it would obviously be made out but if it's

9    immaterial to your Honor's sentence, and immaterial to

10   the guidelines, I would submit there's no reason to have

11   any fact-finding on the issue.

12             THE COURT:  Okay.  First, I do believe based

13   upon the facts that this enhancement does apply, the use

14   -- the penetration of a prepubescent child including

15   through items and articles such as a toothbrush or a toy,

16   I believe warrant the enhancement, and the conclusion

17   that such conduct would be painful and sadistic within

18   the meaning of 2(g)(2.2)(B)(3), and falls within the

19   sadistic and masochistic acts that I think would warrant

20   that particular enhancement for guidelines

21   2(g)(2.21)(B)(4)(a) and (b).

22             However again, I just want to -- the record to

23   be clear, even without those four levels, the total

24   offense level is 45, and therefore it does not have an

25   impact, which is still off the charts, and in any event,

20

Proceedings

1  the issue of whether or not it did cause pain to Ms.

2  Kalichenko's daughter is not something that the Court --

3  is not material to the Court's sentencing, this issue of

4  pain or no pain, as relates to this conduct is not

5  entering into the Court's consideration with respect to

6  the sentencing.  So it is immaterial, both from a

7  guidelines stand point and to the sentence that the Court

8  is imposing, okay?

9          But having resolved that, I adopt the

10  information contained in the pre-sentence report as

11  factual findings by the Court.  The Court adopts the

12  calculation contained in the pre-sentence report, and

13  again just to summarize it, it's a base offense level 32,

14  because Ms. Kalichenko's daughter was under two-years-old

15  at the time of the offense.  It was -- had not attained

16  the age of 12, four levels are added becusae the

17  defendant engaged in sexual acts as are described in

18  paragraph 33, and other places in the report, which I

19  won't repeat here with her daughter, two levels are

20  added.  Because she sent the videos to Mr. Valerio, two

21  levels -- two additional levels are added under (b)(3).

22          I discussed the four-level enhancement for --

23  under 2(g)(2.1)(B)(4)(a) and (b).  Because she is the

24  mother of the victim, there is a two-level enhancement

25  under 2(g)(2.1)(B)(5), and because there was a pattern of

21

Proceedings

1  activity involving multiple videos as are set out in the

2  pre-sentence report involving prohibited sexual contact

3  with her daughter, again as described in paragraph 41,

4  and other places of the report, which describe the

5  videos, there's a five-level enhancement under

6  4(b)(1.5)(B)(1), the -- that's a level 51.

7        Because she pled guilty, that she accepted

8  responsibility for the offense, is entitled to a two-

9  level reduction under 3(e)(1.1)(A), for a total offense

10  level of 49.  And again, whether it's a 49 or a 45, the

11  guideline calculation where -- in that instance, it would

12  be life under the guidelines.  However, in that

13  situation, the effective guideline range becomes the

14  total statutory maximums when they're stacked together,

15  although before I do that, I should just get the

16  government to formally, as I said in its letters, dismiss

17  Count 2.

18        MR. BODE:  Yes, your Honor.  I'll move to

19  dismiss Count 2, your Honor, without prejudice, should

20  anything arise with the sentencing and it all unravel, I

21  would ask that that be without prejudice.

22        THE COURT:  Okay.  No objection to that?

23        MR. SINGER:  No.

24        THE COURT:  Okay.  Count 2 is dismissed without

25  prejudice.  Should there be some issue that arises with

22

Proceedings

1  respect to the sentencing, but having dismissed Count 2,

2  the total effective number of years is 110 years, is the

3  total statutory maximums that are available for the

4  remaining counts, 1, 3, 4 and 5.  So that becomes the

5  effective guidelines range, which is obviously an

6  effective range of life, in any event.

7        However, as everybody here knows, the

8  guidelines are only advisory pursuant to United States v.

9  Booker, and its progeny, the Court considers the

10  guidelines as one factor, among all the statutory

11  factors.  The Court is also aware of the Second Circuit's

12  guidance in Dorby (ph.), and other cases that relates --

13  as it relates to this guidelines. The Court should be

14  particularly careful because of issues of double

15  counting, and other related issues, as it relates to the

16  guidelines, as related to child pornography offenses, or

17  here -- and also obviously involving the sexual

18  exploitation of the child is Count 1 of the counts --

19  more than one of the counts that are involved here.  But

20  in any event, I'm aware of Dorby, and its progeny, as

21  well.  All right?

22        So with having calculated the range, and

23  adopting the information in the report, I will now hear

24  from both sides in connection with the sentencing,

25  starting with Mr. Singer.

23

Proceedings

1    MR. SINGER:  Judge, as I indicated in my letter

2  to the Court from April 15th, the defense is requesting

3  the minimum sentence permitted by law, which is 15 years.

4  I continue to be at a loss as to how the government can

5  view Ms. Kalichenko through the lense that they have

6  chosen to view her.

7    She -- Ms. Kalichenko is not a danger to

8  anybody.  She has exhibited in no way, shape, or form, in

9  any other context, an interest in child pornography, an

10  interest in sexual contact with a child, with making

11  money off of this type of conduct.

12    The only reason that Ms. Kalichenko ended up in

13  this courtroom was through her involvement with Mr.

14  Valerio, and your Honor is certainly familiar with Mr.

15  Valerio's circumstance.

16    Ms. Kalichenko, a do many foreign individuals,

17  was looking for a pathway to get to the United States,

18  was looking for a man to support her, certainly

19  consistent with her culture, and with something that is

20  not at all uncommon.  She was seeking a pathway to the

21  United States, and seeking some support.

22    And in pursuing that, she landed in the hands

23  of a violent sexual predator, Joseph Valerio, and became

24  his victim, as other women have, as well.  And the

25  conduct that resulted, it wasn't forced, it wasn't done

24

Proceedings

1   under a legal form of duress, but it is completely at

2   odds with anything that she'd ever done.

3        And while the government focuses solely on the

4   fact that she did it for the money, to limit the

5   relationship with Mr. Valerio, and the control, the

6   psychological control that Mr. Valerio had over Ms.

7   Kalichenko at the time, to limit that to gee, she was

8   just doing it for the money does not do justice to the

9   circumstances.

10       While someone outside of that type of

11  relationship can't easily understand why a person would

12  do things that they would otherwise find abhorrent, it

13  doesn't make it any less true, the thing -- that this

14  happened to Ms. Kalichenko, as it does with many, many

15  other people, under varied circumstances.  Victims of

16  abuse do things that they would not otherwise do.

17       As I pointed out in my letter, she didn't make

18  any other effort -- if it was about the money, and if she

19  was willing to sexually abuse her daughter for money,

20  there were many other opportunities, many other ways that

21  she could monetize that, and she's never sought to do any

22  of that.

23       And then the notion that Ms. Kalichenko was

24  attempting to extort Mr. Valerio, it's like we stand

25  back, and we take all context away from the situation

Proceedings

1    that had gone on over these years, his abuse -- Mr.

2    Valerio's abuse of Ms. Kalichenko, his continued abuse,

3    even when she went back to the Ukraine, and to -- and Ms.

4    Kalichenko's abhorrance of what she'd done now -- you

5    know, sometime after the videos had been created, and now

6    when she's reached to the U.S. government in order to

7    stop Mr. Valerio from trying to adopt her, from adopting

8    a child from the Ukraine because she knew what he was

9    capable of.

10            To take all of that context out, and simply say

11   oh, she was extorting him, rather than seeing it through

12   any other possible lens, which is she -- which is perhaps

13   compensation for what she had been put through, which is

14   to make him pay a price for what he'd done.  I mean, at

15   the time of this so-called extortion, Ms. Kalichenko had

16   already spoken more than once to agents of the U.S.

17   government, and it provided the evidence to them.  I

18   mean, the gig was up at that point.  Mr. Valerio didn't

19   know that, but it wasn't as if she could undo anything of

20   this.

21            And given all that, we know that Ms.

22   Kalichenko's mother, and specifically her daughter who

23   was the victim of the sexual abuse, the daughter has

24   suffered no ill effect, other than the loss of her

25   mother.  I just received in the last number of days,

26

Proceedings

1  another video from the daughter.  It's in Russian.  I

2  couldn't get it translated, and provide it to the Court,

3  but she's repeating that she loves her mother, and wants

4  her to come home.

5          So there isn't -- I mean, the U.S. government,

6  is seemingly stepping in as the protector, or the

7  purported protector of a Ukrainian citizen who is not

8  asking for, and doesn't want, and doesn't need their

9  assistance, but they're going to simply view Ms.

10 Kalichenko as someone who engages in sexual abuse for

11 money, and then tries to extort another person for that,

12 taking -- again, taking all context out of the

13 circumstances.

14         And beyond that, Ms. Kalichenko was back in

15 Ukraine.  She was in -- her -- the visa that she had to

16 travel to the U.S. had been revoked.  So she was not

17 coming back to the U.S., her daughter was not coming to

18 the U.S., but what the U.S. government had was a violent

19 sexual predator living, and operating, and committing

20 illegal acts on Long Island, in the Eastern District of

21 New York.

22         And that person was able to be arrested, and

23 prosecuted, and imprisoned for his conduct, and none of

24 that would've happened.  How many untold other victims

25 there could have been or may have been without Ms.

27

Proceedings

1   Kalichenko having stepped forward, is unknown but we

2   would certainly know what Mr. Valerio was capable of, and

3   he would not have been arrested, he was not -- without

4   Ms. Kalichenko, without her assistance.  With her

5   statements they were able to get search warrants for his

6   home, and gather evidence, and arrest him, and prosecute

7   him.  And they even, although they did not -- the

8   government did not call Ms. Kalichenko at the Fatico

9   hearing.  They certainly were not happy with what she had

10  to say.

11          Not only did the Court credit her -- Ms.

12  Kalichenko's testimony about the abuse that she -- that

13  was suffered at the hand of Mr. Valerio, the government

14  agreed with that, as well, and used it in their own

15  arguments to enhance Mr. Valerio's sentence.  So they

16  knew the full circumstances of how Ms. Kalichenko got

17  into this.  They knew the full circumstances, and the

18  human circumstances that go into this type of conduct,

19  the office prosecutes men and women involved in either

20  production or distribution of child pornography, or

21  engaging in acts of sexual abuse against children.  And

22  regularly offer cooperation to people under those -- who

23  are prosecuted for those acts, and for some reason,

24  they're willing to take all the benefit that Ms.

25  Kalichenko gives them, and they're not willing to view

28

Proceedings

1   her in any lens other than this narrow lens that they've

2   chosen to view her through.

3           As I've said in my letter, and I said it

4   earlier, it is unconscionable that the U.S. government

5   can in essence, use and take advantage of Ms. Kalichenko,

6   the defendant in this case, in the manner that they have.

7   They have the legal right to do it.  They certainly lack

8   any moral authority when they make the decisions that

9   they make here, and the prosecutorial decisions that they

10  made here.

11          Judge, given all of these circumstances, and

12  considering all of the factors under 3553, I would urge

13  your Honor that a 15-year sentence is more than

14  necessary, and that the Court should sentence Ms.

15  Kalichenko to that minimum of 15 years.  Thank you.

16          THE COURT:  All right.  Thank you, Mr. Singer.

17  Ms. Kalichenko, you also have the right to speak to the

18  Court before you're sentenced.  This is your opportunity

19  to say anything you wish to say, and you can remain

20  seated.

21          THE DEFENDANT:  What I would -- yes, I would

22  like -- did you receive what I had objections to the

23  conclusion?

24          THE COURT:  Yes, I did receive that, and I've

25  read it.

Proceedings

1        THE DEFENDANT:  Yeah, this says -- this first

2   folder that I wanted to say in terms of my view to the

3   Court that it's very clear, you know, how if you want me

4   to read it again, I mean, I can read it.

5        So I said that in order for me to properly

6   describe my attitude to the content that occurred in

7   2012, as a result of my relationship with Valerio, I want

8   to go back to the letter wrote to me by (indiscernible)

9   year, in the very first phase.

10       First of all, let me tell you that I'm

11  extremely sorry for what I did, producing videos with my

12  daughter, for what I did during my toxic and abusive --

13       MR. SINGER:  Slow down.

14       THE DEFENDANT:  -- relationship --

15       MR. SINGER:  Slow down.

16       THE DEFENDANT:  -- with him.

17       MR. SINGER:  Slow down.

18       THE DEFENDANT:  I want to tell you that I

19  realize that it was very wrong, and unacceptable behavior

20  from my side, and as I look back on time, and my actions

21  back then, I feel very much disgusted of myself, and my

22  soul is crying to the Lord, and is asking him for

23  forgiveness, the same as I ask my daughter to forgive me

24  for my actions to her, as well.

25       I also have a very strong faith in God, and

Proceedings

1   here in MDC, I have been studying bible a lot, so I want

2   to tell you, to let you know that my complete view of the

3   words, the same of sexual immorality has entirely

4   changed.  Not only I consider sexual misconduct, the

5   words -- the words that minor has to be a huge sin, but I

6   also consider homosexuality, and any sexual relationship

7   as an adult man, if it outside of the legal marriage to

8   be a sin also.

9         I do believe that the proper relationship

10  between a man and woman is supposed to be based on true

11  love, and such issues as money, and success,

12  (indiscernible), et cetera, should not play a role when

13  selecting a lifelong partner for yourself.

14        And I do also believe that all sins, including

15  the sin of sexual immorality do have eternal consequences

16  for your soul in the afterlife.  In the afterlife, I will

17  have to face God by himself, as my judge.

18        Also, Mr. Donoghue want to -- I want you to

19  understand that it's not only because of you, or Judge

20  Bianco, or anybody else, with all the respect, but I have

21  a great fear for the Lord, and I do sincerely repent, and

22  it is --

23  (Pause)

24        THE DEFENDANT:  -- and it's very important for

25  me to get forgiven by him.

31

Proceedings

1   (Pause)

2          THE DEFENDANT:  I also love my daughter, and

3   it's very important for me to be forgiven  by her, and my

4   mother.  Also because both of them are suffering at the

5   moment, of my actions.

6            The actual offense took place seven years

7   ago.  I did have a lack of judgment at that time, but I

8   have transformed my way of thinking entirely.  The root

9   of my problem -- the roots of my problem at that time

10  were the fear that my family, and the -- that me, and my

11  family were financially dependent on Mr. Valerio, and he

12  used my vulnerability and desperate situation at that

13  time, my fear for my family to end up on the streets,

14  again, in order for me to make videos.

15         My daughter was just being retrieved from us --

16  by us from the orphanage, where she was placed with the

17  40 other kids with lack of nutrition.  Me and my mother

18  were homeless since 2008, consistently for four years,

19  including my pregnancy and giving birth to Sophia before

20  the actual offense took place.

21         Mr. Valerio knew, and he was making fun of me,

22  saying that if it was not up to his mercy, we would end

23  up dying the streets of Kiev.  I still remember those

24  words of him.

25         My mother has already provided the testimony

32

Proceedings

1  where she testified in full details, the videos were made

2  by me out of economic duress.  The Court is in the

3  possession of my mother's testimony.

4         And the greed factor is entirely contradicts my

5  mother's testimony.  However, I do agree that economic

6  duress is not a defense to the crime.  And I want to

7  stress about that I do agree that economic duress is not

8  a defense to a crime, but rather me to get in

9  circumstances.

10        And I remember that Mr. LaRusso wanted to

11  present this as a defense but I didn't think it's a

12  actual defense, and I think that I should have come up

13  with another solution to get the money that was necessary

14  for my family, at that time, in order to secure basic

15  needs, such as shelter and food.

16        Another tough lesson that I had to learn was

17  for me to earn the money with my own labor, which I have

18  been successful in doing since my arrest, and also trying

19  to send the money to my family out of my paycheck.  And I

20  was working with the -- and I was -- -- and I was working

21  with the laundry, and I was paid around $90 a month in

22  2017.

23        I was trying to -- to save like $50 from every

24  paycheck that I have, and I -- and I would send to Mr.

25  LaRusso in order for him to wire the money, you know, to

33

Proceedings

1  my family, because it's my responsibility to take care

2  about the well being of my mother.  And I believe she

3  testified to that.

4          I also arranged a few packages with the

5  clothes, food, candy, et cetera to present to my daughter

6  by one of the member of the Ukrainian community who lives

7  in New York, even though it was my money spent, but I was

8  looking for every single opportunity to help my mother

9  since my arrest.  Despite of the fact that my

10  opportunities to anyhow help my mother from the jail, are

11  extremely limited.

12          So you know included a lot that there was --

13  that there was, you know, a lot of evidence to suggest

14  that I would take care of my daughter specifically when I

15  had the money, and the Court's in the possession of, you

16  know, the pictures of where we were together, like in

17  Turkey, and (indiscernible) where I took her to resort in

18  the Disney World and, you know, the other places where

19  we've been together, in Kiev, and they're in other cities

20  in Ukraine.

21          There was also additional testimony of Mr.

22  Dicleli, I don't know if the Court has his letter.  So he

23  was testifying about how he observed my relationship to

24  be with my daughter, and he also observed how -- he also

25  testified to the act how I interacted with his son, you

34

Proceedings

1    know?  So he said -- I have a copy of the letter.  I

2    don't know if you have his letter in your possession.

3              THE COURT:  You can hand it up.  I think it --

4    do you ahve it there?

5              THE DEFENDANT:  Yeah, I do.  I do have it. I

6    say -- because we provided that to you before --

7              THE COURT:  Yeah, I think --

8              THE DEFENDANT:  -- but I don't know --

9              THE COURT:  I just want to make sure it's the

10   same one.

11             THE DEFENDANT:  Don't know if you have it.

12             THE COURT:  That was an exhibit to Mr.

13   LaRusso's submission, correct?

14             THE DEFENDANT:  Yeah.

15             THE COURT:  Yes.

16             THE DEFENDANT:  Yes, well --

17             THE COURT:  But you can hand it up again if you

18   want.

19             THE DEFENDANT:  Yeah, I can hand it -- but he

20   was -- he was testifying about my interactions with --

21   well, just a second.  I give you.

22   (Counsel and client confer)

23             THE DEFENDANT:  Rihgt.  So he's saying that

24   there's also testimony from Mr. Dicleli who saw my

25   interactions with some family in 2013, and additional

35

Proceedings

1   testimony of how I interacted with his son.  So he was

2   saying in addition, I have noticed that Olena is very

3   gentle and loving to those children.  While Olena was

4   staying in my house, I would give her money for her

5   personal spending, and tried to help her family by

6   sending them money.  I noticed from that money, Olena

7   would buy snacks and candies for my son to make him

8   happy.

9          If I had to come home late, she would properly

10  feed my son, and take care of him, as I trusted Olena.  I

11  had no hesitation to leave my son with her.  But there is

12  more in his letter.  He was talking like -- I don't know

13  if you have it.

14         However, I do agree that I should have stayed

15  away from Mr. Valerio from the very beginning, and I

16  should not even be looking for a man abroad, especially

17  using a dating site.

18         As the (indiscernible) described that I was on

19  a mission to find a husband, I think it's true.  I think

20  it's true but I think that instead of actively searching

21  online, I should have just, you know, waited until God

22  puts the right person in my life, and I should have --

23  and I should have relied only on myself when providing

24  for my family.

25         So once again, I want to say that I do not

36

Proceedings

1   think that economic duress is a defense to a crime, and I

2   think that I should have come up with another solution

3   for the money to provide for the basic needs for my

4   family.

5           And I think that I should have contacted Mr.

6   Valerio at all.  You know, never entered into a

7   relationship with him.

8           A psychologist who -- yeah, because there was

9   in terms of my sexual characteristic, like I just want to

10  -- the Court to understand that, I have been interviewed

11  by the psychologist with this regard, and she stated that

12  my only sexual interest is an adult man, obviously, you

13  know.  And I want the Court to understand 100 percent

14  that my personal view in terms of the sexual -- any kind

15  of acts or morality, I -- I consider to be a huge sin.

16  This is how I see, you know -- this is how I see it.  I

17  consider it like, I'm against it, absolutely, and 100

18  percent.

19          Like I did -- I did it, yes, I did it, and it

20  happened because out of the economic duress, and I

21  understand it was wrong, and I understand that I should

22  have -- should have, you know, done another -- should

23  have, you know, found another solution, how to provide

24  money that was needed for my family at that time, that I

25  should have never asked Valerio for any kind of help at

37

Proceedings

1    all; I agree, and I acknowledge.

2           But my view towards this kind of a behavior,

3    and towards it, it's completely unacceptable.  That's how

4    I see it from -- from -- from the Christian beliefs.

5    That's how -- that's how I believe, you know, that's --

6    that's my personal view, and my attitude towards this

7    issue.

8           And I want to say also that despite of the

9    current offense, I have -- I have no interest, no

10   pornography of whatever, and I never watched no

11   pornography, neither before or after offense.  You know,

12   like I have no interest in this kind of issues at all.

13          As I have previously indicated, I consider it

14   to be a huge sin, and even if seven years ago, I may have

15   had a lack of judgment, but I have reassessed my entire

16   way of thinking, and I agree that pornography, even adult

17   is wrong, and it gets eternal consequence for your soul.

18   So that's -- this is my view.

19          Also, I wanted to just state that even the year

20   of 2015, after Valerio approached me, you know, asking

21   him to help with the adoption of the child from my

22   country, I did have a severe concerns in my mind, as to

23   the true reason, just as to why he wanted to adopt a

24   child.

25          There is a lot of, you know -- there is a lot

38

Proceedings

1   of evidence that I brought, you know, emails and stuff

2   like that, that can be discusssed about the adoption

3   issue and my maturation but I don't know if it's needed

4   but I did bring it, and I specifically, you know, wrote

5   everything, you know, how it happened, and why it

6   happened.

7              But I wanted the Court, you know, to point that

8   I was -- that -- that was the true reason as to -- my --

9   my -- I had a serious concern with regards to Valerio's

10  intention as to why he wanted to adopt the child.

11             THE COURT:  Why didn't you --

12             THE DEFENDANT:  This is something.

13             THE COURT:  -- why didn't you go to the

14  authorities from the time you stopped having a

15  relationship with him, until you got that email in the

16  summer of 2000- and --

17             THE DEFENDANT:  Why I didn't go to authorities,

18  which authorities, and about what exactly?

19             THE COURT:  Well, you started -- you broke off

20  with Mr. Valerio, contact with him in November --

21             THE DEFENDANT:  Yeah, November 2012.

22             THE COURT:  Right.  October, I think you met

23  another man, you said?  You were --

24             THE DEFENDANT:  Yes, I was in another

25  relationship then --

39

Proceedings

1      THE COURT:  All right.

2      THE DEFENDANT:  -- after I --

3      THE COURT:  But you didn't contact the FBI or

4  any authorities until August of the following year.

5      THE DEFENDANT:  Exactly.  I didn't want to

6  contact nobody, but Mr. Valerio until he contacted me in

7  summer 2013 with his request.  So this is why I decided

8  to --

9      THE COURT:  But what I am suggesting to you, if

10 you were worried about what Mr. Valerio might do to other

11 people, you already knew, before you got the email about

12 adoption, you already knew he was a sexual predator.  You

13 knew what he had made -- you knew what he had done to do.

14 You knew what he had made you do, you know, erquested

15 that you do with respect to your daughter.  So you

16 already knew that he was a danger to children.

17     THE DEFENDANT:  Yeah, I -- I knew based on my

18 personal relationship with him, but he didn't -- but --

19     THE COURT:  But you didn't take any action to

20 prevent him from hurting anybody until you had this email

21 about an adoption.

22     THE DEFENDANT:  Well --

23     THE COURT:  What made you think before that

24 that he wasn't going to hurt anybody?

25     THE DEFENDANT:  No, okay, your Honor, I

Proceedings

1  understand from your perspective that's how you think,

2  and you may be right about it, but you know this was not

3  entering my mind.  This was not entering -- in my mind

4  was the concerns about, you know, my family that would --

5  that was in my min, until he contacted me with this

6  request.  After he contacted me with the request, then I

7  realized that this is what he might do to -- and he

8  contact -- and his intention was to get a child from my

9  country.

10       You know, I was not concerned about his life.

11  I didn't care about his life -- like, you know, I was --

12  he was out of my life until that time when he approached

13  me with this request.

14       After he approached me with this request, the

15  very first question that I asked him was why do you want

16  to adopt a child.  This is the very first question that I

17  asked him in my response to him.  If you -- if you want

18  to check the email, I have it.  I brought it

19  specifically --

20       THE COURT:  No, I -- I'm -- again, I am not --

21  I understand, the emails are there, and I'm not disputing

22  what happened once you got that email.  I accept your

23  recitation of what happened.  I don't even think the

24  government disputes that.  So that's not -- you don't

25  have to document that.  It's documented in the emails.  I

41

Proceedings

1  know that you met with the FBI at LIAD (ph.), so that's

2  not the issue.  But --

3            THE DEFENDANT:  Mr. Valerio, his email, he

4  asked me a -- he specifically told me that he wanted to

5  adopt specifically, a girl, if you go through his email,

6  you can see.

7            MR. BODE:  And we actually do have a very big

8  dispute there, your Honor, in that even that after that

9  email, she still wants to negotiate.

10           THE COURT:  You've got to use the mic.

11           MR. BODE:  She still wants money from him.

12           THE COURT:  Youv'e got to use the mic.  Hold

13  on.

14           THE DEFENDANT:  There was nothing --

15           THE COURT:  Hold on.  Hold on.

16           MR. BODE:  Judge, I will address, we very much

17  vigorously do object the fact that she even after that

18  email, after finding out he wants to adopt a child, she's

19  willing to overlook all that for money if he's willing to

20  negotiate.

21           THE DEFENDANT:  That's not true.

22           MR. BODE:  I'll discuss that in a moment.

23           THE DEFENDANT:  That's not true.  You should

24  probably go into the evidence because first of all, he's

25  offering me money.  If you look into his email, he's

Proceedings

1   offering me compensation for an adoption.

2          So what I would -- I got to -- to -- if I was

3   about his money, why wouldn't I simply accet his

4   compensation offer to me?  That is what he is offering.

5   Isn't it be easier for me to simply accept his offer for

6   adoption, and tell him to come to Ukraine, and I'm going

7   to help him with adoption?  Isn't that the way it should

8   be?  He's offering me money.  Come help me with adoption.

9   This is the money.  Take it.  This is what I did.

10          THE COURT:  Okay.  Ms. Kalichenko, is there

11   anything else you want to say?  Obviously, I have your

12   whole -- I have your letter to the government.  I have

13   your letter to the Court on August 10th, so it --

14          THE DEFENDANT:  Yeah, just one second.

15          THE COURT:  And if you want to hand up that

16   letter from Mr. -- I don't know how you pronounce his

17   last name -- does she have that, Mr. Singer?

18          MR. SINGER:  This is the letter that was --

19          THE COURT:  Yeah, I was just looking through --

20          MR. SINGER:  This was attached to --

21          THE COURT:  I looked -- I don't see it as an

22   exhibit.  I'm familiar with his support of her, but I was

23   trying to find it in the -- I don't know we're I knew

24   that from.

25          MR. BODE:  I know it's -- I know it's in an ECF

43

Proceedings

1    filing, your Honor, because I know I -- that's where I

2    read it.

3            THE COURT:  Yeah, I'm familiar with it.  I just

4    wanted to -- I didn't bring it out here with me.

5            THE DEFENDANT:  I have a -- I have a copy.

6    (Pause)

7            MR. SINGER:  And, Judge, it's a two-page letter

8    dated ovembr 15th of 2014 from Mura Dicleli.

9            THE COURT:  Why don't you just hand it up.

10           MR. SINGER:  And I don't know -- I had it

11   indicates that it was --

12           THE CLERK:  You need to stand by the

13   microphone.

14           MR. SINGER:  Oh, I'm sorry.

15           MR. BODE:  And for the court reporter who

16   eventually gets this recording, your Honor, it's M-U-R-A-

17   T  D-I-C-L-E-L-I, according to paragraph 62 of the PSR.

18           THE COURT:  Okay, and it's --

19           MR. SINGER:  And it was filed as under document

20   number 58, and it was the 26th exhibit or document under

21   that.

22           THE COURT:  Yes.

23           THE DEFENDANT:  This is also, I send it up to

24   the Court, as in possession of my -- oh, okay.

25   (Pause)

44

                              Proceedings

1          THE COURT:  Okay.  And again, just for the

2    record, so this was filed way back in 2015, and I have

3    re-reviewed it, and as I said, I'm obviously aware of his

4    support for Ms. Kalichenko, okay?

5          All right.  Go ahead, Ms. Kalichenko.

6          THE DEFENDANT:  Yes, there was so -- the -- the

7    -- my August in my letter to Valerio, saying that the

8    Court is in possession of it, so I think it clearly -- it

9    clearly says this is my email that I am writing to him.

10   So I am telling him that "I sincerely believe that the

11   reason you asked me to help you with adoption in Ukraine,

12   is because you want to get an innocent child in your

13   hands, in order to comfortably abuse a child, and you

14   asked for a girl only.  You are a mentally sick person,

15   and you must be stopped."

16          If there is any extortion, so that why did I

17   include it in August, give me some money or something

18   like this, like this is what I'm not getting.  Like this

19   is in my August email to Valerio.

20          I'm specifically telling him I sincerely

21   believe that the reason you asked me to hello you with

22   the adoption is because -- because you want to get an

23   innocent child in your hands, in order to comfortably

24   abuse a child, and you asked for a girl only.

25          And also my concern was because he indicated to

45

Proceedings

1   me that he was talking through the Anastia (ph.), the

2   website, to the other women in Ukraine.  I don't know if

3   you know what this site is.

4               THE COURT:  No.

5               THE DEFENDANT:  Oh.

6               THE COURT:  But I -- I am aware of this, his

7   contact with other women.  That's in your pre-sentence

8   report, paragraph 11, but you don't have to go into the

9   details of the website.

10              THE DEFENDANT:  No, just wanted you to know

11  that I realized that he -- he was in communication with

12  other women in the Ukraine, who he told me he was, and he

13  -- and some -- my way of thinking was that he could have

14  easily approached another lady with the same request.

15  Another lady would have helped him with the adoption from

16  my country because she didn't know -- she wasn't in a

17  relationship with him.

18              And same as he approached me with same request,

19  offering me money, he could have approached another woman

20  with this.  So I knew that, and that that was also one of

21  the reasons why I decided to, you know -- to send an

22  email to -- to the embassy, regarding the Valerio.

23              But it was not even my first -- my first

24  intention how to, you know -- because when Valerio

25  contacted me, I was staying at Mr. Dicleli's house, as I

Proceedings

1  think I told the Court, and I showed all of these emails

2  to him.

3          So he actually confirmed my beliefs, that the

4  reason why Valerio wants to take -- take a child from

5  Ukraine, as to abuse him.  So I shared my beliefs, you

6  know, with him, and the decision to report him, was not

7  only my decision, it was a decision that we made

8  together.

9          So in our initial plan was because he was in

10 -- because hew as in August.  He was going to New York.

11 Had a trip to New York, and I'm telling Valerio in my

12 August email, I'm telling him that my fiance's got it in

13 New York, and we made a decision to submit all the

14 documents directly to New York police.  So that's what

15 I'm also telling him.

16         So because -- so that was our initial -- you

17 know, like a decision for him to go approach, you know,

18 the New York police, and -- and to talk about Valerio,

19 you know, for him, but he was present in -- in New York

20 in August of 2015.

21         But only after that, did that happen, then I

22 decided to contact the American Embassy with this request

23 by myself because there is much more to this story, than

24 -- than maybe, you know, that the government is trying to

25 say, in that regard.

47

Proceedings

1          And also there was -- at that time, I had a lot

2    of money of myself.  I have applied to -- and I think I

3    do have my bank statements, at least Mr. LaRusso had.  I

4    don't know if the Court has it, or if it does not has,

5    but I specifically have a bank statement of my bank

6    account, in terms of how much money I had at the time

7    when Mr. Valerio has been reported, because at this

8    specific time, I have a -- I have applied for a business

9    school in England, and I have paid out of my personal

10   bank account by myself.  I was not in need of Valerio's

11   money at that time, whatsoever at all.  You know, that's

12   just something that I wanted to add.

13          Absolutely, under no circumstance I would

14   consider to anyhow come back to Valerio after I

15   discovered that he had any interest in children because

16   after my -- you know -- you know that my fiancé visa has

17   been revoked, and I never for me and for my daughter --

18   oh, I'm sorry, my tourist visa to U.S. has been canceled,

19   and I never reapplied for a fiance visa to the U.S.,

20   neither for myself, nor my daughter.

21          And as I indicated already in my letter to

22   Donoghue, I'm extremely grateful to God that my tourist

23   visa to U.S. has been canceled, in that -- in -- yes, and

24   that we never had a chance to actually come back and

25   leave, as Mr. Valerio under the same roof because that

48

Proceedings

1   would be a disaster.  So I'm, you know, grateful that

2   that did not happen.

3          They are very -- I think that probation officer

4   was questioning as to why I did not immediately leave

5   Valerio after he raped me at his house.  So I already

6   indicated that despite -- despite of the fact that he

7   abused me, my daughter was still at the orphanage at the

8   time -- at that time.

9          And he was the only person who has agreed to

10  help me, to take her out of the orphanage, and even from

11  his house, I used to call him, you know, to check on my

12  daughter to see if she was all right, but the principal

13  refused even to talk to me because she said that she had

14  many kids in her care, and Sophia was not her priority.

15         And first of all, despite of the fact that

16  Valerio abused me personally, but I saw him interacting

17  with his son, because I met his son -- you know, his son

18  was staying at his house, and I also knew that he had a

19  daughter with the -- with the lady from the South Africa.

20  I don't remember her name.  I think it's Angelique,

21  something -- something like that.

22         And I saw that he was sincerely concerned about

23  the kid, and I saw that he was arranging a trip to London

24  to meet with his daughter, and my observations were that

25  his feelings towards his daughter with this lady from

49

Proceedings

1   South Africa, very sincere, and I also knew that that

2   lady -- this lady, she lived with Valerio for more than a

3   year in his house, and I knew that she brought her own

4   son to stay together with Valerio, and to make a family

5   with him.  You know?

6         So and I also knew that because he told me that

7   the son of his lady was not his biological son, you know,

8   and -- but he told me that he accepted his -- his -- her

9   son as his own child, you know?  So that's why I saw that

10  he -- he could accept my daughter as his own, same as he

11  accepted the son of that lady, despite of the fact that

12  he was not his biological son, but that was before, you

13  know, I discovered -- that was -- that was when I still

14  was staying in house, that's from -- that's from what he

15  told me, you know?  So those were my, you know,

16  observations.

17        The end of my objections were that once again,

18  I wanted to say that the economic duress is not a defense

19  of a crime, and I should have come up with another

20  solution that was necessary to secure the basic needs for

21  my family at that time.  And even if I had lack of

22  judgment with regards to my behavior seven years, I have

23  in time reassessed it, and I understand all the things,

24  including the sin of the sexual immorality do bear

25  eternal consequences for your soul.  I do have the great

50

Proceedings

1   fear for God, and ask him, and my daughter for

2   forgiveness constantly.

3            I wanted to say but I think the Court knows,

4   you know, I wanted to point out, the cases of the other

5   ladies, right?

6            THE COURT:  Yes, I've -- again, Ms. Kalichenko,

7   I've -- you know, I've read your letter.  I've looked at

8   all of those cases.  You don't have to reread their

9   letter to -- about those cases.

10  (Pause)

11           THE COURT:  Although I will say, Mr. Singer,

12  that the Norton case, Ms. Norton -- I mean, I've looked

13  back at that one, and that was over a few-day period, and

14  was simulated sexual acts, if I'm not mistaken.  Is that

15  correct?

16           MR. BODE:  That's what probation indicated,

17  your Honor.

18           MR. SINGER:  That's correct, your Honor. Yes, I

19  was the attorney who represented Ms. Norton.

20           MR. BODE:  Probation also indicated, your

21  Honor, and Mr. Singer will correct me if I am wrong, all

22  the documents are wrong, so I can't see them, but

23  probation indicated --

24           THE COURT:  No, that's --

25           MR. BODE:  -- that the mother in that case,

Proceedings

1   they believe was to aware she was being recorded on a web

2   cam on the other end.  So she wasn't trying to produce

3   child pornography, and there was no financial motive, as

4   other -- also.

5            THE COURT:  All right.  Is there anything else,

6   Ms. Kalichenko?

7            THE DEFENDANT:  That was on the issue, I was

8   trying to point -- I was trying to point to the issue as

9   to why even despite of the fact that he abused me, I

10   still wanted to marry him.  It was before I even

11   discovered that he had an interest in kids.

12           So he was abusing me, and I was going through

13   the abuse, as to -- but a lot of women, even in this

14   country, I believe they still are, you know, capable to

15   tolerate that abuse because of the other reasons.  And

16   that what I was trying to say was trying to say that I

17   saw him being, you know -- I thought he was caring

18   towards his own kid, because his son lived in our --

19   together with us, and I saw him directly with his own

20   daughter in -- in the -- that was my understanding, he

21   would interact with my daughter as well.

22           And he also told me, which was important for

23   me, that he accepted this lady with -- with his son that

24   she had from her previous relationship which was not

25   Valerio's biological son, and that the Court I think

52

Proceedings

1  knows that I had an issue because not -- like I had an

2  issue because the men in my country, they are not ready

3  to accept me, you know, for men through my country to

4  accept me with a child, it was a problem.

5          But he was ready to accept me with the -- with

6  the child that I had with another man.  This is what I am

7  trying to -- to explain.

8          THE COURT:  Okay.  Is there anything else Ms.

9  Kalichenko?

10         THE DEFENDANT:  Well, as my attorney has

11  pointed out with regards of the other women, I think

12  there is unfairness, but I think that -- that my attorney

13  has already, you know, pointed a lot of this, yes.

14         THE COURT:  Yes.

15         THE DEFENDANT:  That's something that I wanted

16  to stress out, you know, and also that for instance,

17  these women like I personally know them, you know,

18  they've been together with me at MDC.  So it's a similar

19  crime, and you know, I just think it should -- has to be

20  if the law is for the same if, you know -- if the law

21  should be the same for everybody.  You cannot be this

22  person.  We want to, you know, give you credit for

23  cooperation, this person we don't want to give credit for

24  cooperation, and however the crime was actually the same.

25  So I don't -- I don't believe it's fair.

53

Proceedings

1          It's a similar charge, actually the same plea,

2     so she pled to -- she pled to sexual exploitation also,

3     you know, and the two other women, like exactly the same

4     conduct like this, I mean, I don't know.

5          I'm not -- I accept it's wrong, but I'm just

6     saying that, you know, there are cases which are similar

7     to mine, that that's what I'm saying, that initiated out

8     of their relationship with a predator man, in the -- in

9     the same district actually, Eastern District of New York.

10         And I actually wanted to ask the -- you know,

11    your Honor, suppose your -- maybe you can tell me, so Mr.

12    Singer, he agrees that, you know, the government has

13    treated me unfairly, in terms of cooperation, but he says

14    there is no legal basis.  Is there something that you can

15    tell me, like a remedy that can be done, you know, like

16    maybe you as the Court can tell me, like there should be

17    some sort of a remedy how this issue can be considered.

18         THE COURT:  Again, I am not going -- I've

19    already made my ruling with respect to that.  If you want

20    to raise it with the appellate court, you can raise it

21    with the appellate court but my ruling is that the

22    government was not required to give you a cooperation

23    agreement.  They didn't -- the agent didn't promise you

24    anything with respect to that, or anything else.  So I

25    don't want to go back to that issue.  You've made your

54

Proceedings

1    objection to that.  It's pretty clear we've been -- you

2    know, this has been going on for years.  We -- I know you

3    object to that, so I don't want to rehash that again but

4    is there anything else in connection with the sentencing?

5         THE DEFENDANT:  No, I said it.  You know, as I

6    said, I'm extremely, you know, sorry because this

7    behavior unacceptable, and I'm concerned about the future

8    for my daughter.  I'm concerned about her.  I'm concerned

9    about my mom.  There is a new video that she has

10   provided.  I don't think that the Court had a chance to

11   watch it but --

12        THE COURT:  No, but I -- I don't know what

13   another video is going to add to the ones that I have

14   already have.  I understand the situation with respect to

15   your daughter and your mother.

16        THE DEFENDANT:  There is something that I

17   wanted to say, you know, for me, that I would like to

18   proceed for me a chance, whatever the time it is, I can

19   do it in my country.  You know, there is treaty between

20   Ukraine and the United States.

21        So I do -- you know, this -- it doesn't change

22   the conviction, absolutely nothing.  It doesn't change

23   the time but it's going to give me the opportunity at

24   least to see my family.  You know, they will be --

25   because for five years, I didn't see my family at all.

55

Proceedings

1   You know, I have very limited communicated with them.

2   So, you know, I would like to take advantage of this, and

3   I can apply so this is something that, you know, I am

4   hoping that the Court would understand specifically,

5   considering that I will be deported from United States

6   anyway, will never, ever enter this country, will never

7   live in the United States.  Have no interest in United

8   States, you know, so this is something that I would be

9   applying, and I do hope that, you know, that -- I think

10  -- it not up to the Court, I think it's up to the system

11  itself, but, you know, I hope that the Court understands

12  my situation, and my desire to do whatever time, that it

13  is my -- in my home country.

14          THE COURT:  All right.  All right.  Thank you,

15  Ms. Kalichenko.

16          Okay, Mr. Bode, go ahead.

17          MR. BODE:  Thank you, your Honor.  Let me start

18  out just -- I know it's in my letter, just so I am clear

19  what the government is requesting, so we're requesting

20  that the Court impose a nonguideline, below guideline

21  sentence of concurrent 25 years in Count 1, the

22  conspiracy, Count 3, the sexual exploitation, and Count

23  5, the production for importation into the United States.

24          And we're asking on Count 4, that the Court

25  impose a 20-year sentence for the transportation of the

Proceedings

1    child pornography concurrent with those other sentences.

2    So just so I am on the record as to what I'm asking.

3              In terms of Ms. Kalichenko's conduct, your

4    Honor, if anything is unconscionable here, it is Ms.

5    Kalichenko's conduct.  She was a mother who was supposed

6    to be, of anyone else on this earth, supposed to protect

7    that child.

8              Instead, she made 46 videos of her infant

9    daughter, abusing her daughter with toys, objects, in

10   varieties of ways for $12,000.  As I'll get to in a

11   moment, she then tried to extort Mr. Valerio after their

12   relationship broke down, as I'll get to in a moment.

13   That is much, much, worse than most child pornography

14   cases that we see.

15             We hear all the time from defense attorneys,

16   oh, my client didn't do this for a financial motive, it's

17   the producers of child pornography for profit that these

18   laws were really intended to get at, and we hear that

19   constantly.  This is that case.

20             She was producing this for money, and as we'll

21   get to in a moment, that you can see by her chat that was

22   seized in the search of Mr. Valerio's, either phone or

23   computer, what her thought process was, even after she

24   knew how dangerous she says that she knew Valerio was,

25   that he wants to adopt a child and she says she

57

Proceedings

1    confronted him about it, wanting to -- that she knew he

2    was an abuser, but she's willing to overlook all that, if

3    he's willing to negotiate, as I'll get to in a moment.

4           This case is much worse than most child porn

5    production cases, even though they're all obviously

6    awful.

7           And I would say, I am not aware of any other

8    case in this district where a mother has produced child

9    pornography for money.  I'm not aware of any other case

10   in this district by any mother with this level of abuse,

11   and this number of videos, as well.

12          I would also note, even if there were a

13   singular case that a prosecutor at a given time factually

14   felt for reasons of the case or whatever, merited a lower

15   sentence, the rule that we're always -- every defendant

16   thereafter in every other factual situation be the

17   benefit of that one lower decision, would lead to an

18   inevitable rachet of fact in all sentences going down.

19   And each case should stand on its own facts, and these

20   facts here are egregious.

21          In terms of Ms. Kalichenko's argument that she

22   was in dire economic straits, that she -- and that's why

23   this conduct occurred, I submit it's belied by a couple

24   of things.

25          One, the probation report describes her

58

Proceedings

1   financial --

2            THE COURT:  Just stay near the mic.

3            MR. BODE:  Sorry, Judge, I start to walk when I

4   talk, I apologize.

5            She tells us here that she had money of her own

6   in her bank account on the one hand.  On the other hand,

7   she claims that she was in economic distress.  As the

8   government noted in its letter, and we did the -- took a

9   look and we had the citation, the amount of money,

10  $12,000 might seem like a small amount of money but it is

11  not a small amount of money in the Ukraine at that time.

12  I think we cited it was six times the average lower

13  middle class income.  She was rich off of Valerio's

14  money.

15           And it's not just, you know, statistics that

16  say that.  You can actually see it, and we appended to

17  our April letter, her vacation pictures.  She's traveling

18  to Paris, Hong Kong --

19           THE DEFENDANT:  Excuse me.  Excuse me.

20           MR. BODE:  -- Israel, Rome --

21           THE DEFENDANT:  That is wrong.

22           MR. BODE:  -- Barcelona, Estonia --

23           THE COURT:  Let him finish.

24           MR. BODE:  -- Turkey.  She claims oh, she took

25  her daughter to Turkey, so we're supposed to forget all

59

Proceedings

1   that.  This is in the year, year-and-a-half following the

2   receipt of that $12,000.  She traveled the world.  She

3   traveled the world on money that she got by molesting her

4   daughter, and sending those images to a man who she says

5   here, she knew was a horrible person, an abuser, but she

6   was still willing to overlook that for the money, your

7   Honor.

8          She claims that in August, in the email in

9   August, she was concerned about Valerio wanting to adopt

10   a child, and that it would be for ill purposes.  I have

11   no doubt that she had figured out by that point that him

12   adopting a child would be for a horrible purposes, but

13   she didn't come forward to the FBI out of the goodness of

14   her heart.  And we don't have to rely on what she says

15   here after the fact, after she got in trouble, when she's

16   trying to get leniency, when she's trying to get out of

17   it.

18          You can look at what she actually said at the

19   actual time in the texts which we included as an

20   attachment to our April letter.  At this time, you can

21   even see on December 6th of 2013 -- wait.  Yep, December

22   6th, 2013, at 2:21:11 p.m.  She is saying to Valerio it's

23   -- I think it should be, you are so dumb even to know

24   America police don't -- doesn't have jurisdiction

25   overseas.  She believes she can't be caught for this

60

Proceedings

1   conduct.  She believes she's home free but she wants to

2   get money out of it.

3            If you look a few texts above that, the second

4   text on the exhibit, she says to Valerio, "You could've

5   negotiated with me before the criminal case against you

6   was being opened."

7            As to why she would do this?  She thought she

8   couldn't be caught.  She thought she had -- she was

9   jurisdictionally home free, so she could extort some

10  money from Valerio.  And keep in mind, this is six months

11  after she says the adoption -- after the adoption email,

12  not she says, we know that email took place, so she knows

13  he's an abuser, he's trying to get a kid, she's willing

14  to overlook that for a little money.

15           She said -- she tells him in these texts that

16  they opened the criminal case.  I'm referring to December

17  6th of 2013.  "They opened a criminal case against you,

18  and remember, they did that based on very little evidence

19  I provided, and are asking me to send more."

20           And that's why she's negotiating.  Before she

21  sends the more that they're asking for, she wants to milk

22  some money out of Valerio.

23           A little while later on December 7th, the next

24  day, "Okay, Joseph, I'm fed up with you.  I'm sending all

25  the videos I made for you with Sophia to the FBI.  That's

61

Proceedings

1    the only piece needed to get a court order to arrest you.

2    No more mercy for you."

3           She believes what she already come forward

4    through the FBI wasn't enough, so she's going to get some

5    money out of him, and then she's going to drop the rest.

6    And that is what happened.  She did come forward with

7    additional videos after he failed to pay her money, as

8    you will recall in Agent Angelini's (ph.) testimony.

9           She says, "I was keeping the case on hold

10   because I didn't want you to go to jail."

11          She asks him on December 7th, later in the day,

12   "Why should I not cooperate with them?"

13          On the second page of the text messages, she

14   says, "Joseph, I also have a copy of the CD I sent you

15   through DHL.  Will give it to the guy's tom" -- which

16   stands for tomorrow, "The record you received, it is

17   maintained with the service.  I see you really don't want

18   to recognize your mistakes and negotiate.  Let's play

19   hard then."

20          And then she follows-up two days later, again

21   trying to get money out of him, trying to "negotiate."

22   "Joseph, I now have eight different videos I made for

23   you, not counting the ones I sent through DHL.  FBI is

24   asking me every single day, either I'm sending the

25   additional evidence to them, I don't think you really

62

Proceedings

1   understand how serious this matter is.  I'm asking you

2   for the last time, would you like me to provide to the

3   police everything I have, or would you like to

4   negotiate?"

5          She's extorting him for money, and this is by

6   her own admission here today, it's after she knows what a

7   horrible person he is, that she knows he's an abuser.

8   He's even trying to adopt a child, to molest a child, but

9   she's willing to forget all of that for money.

10          And then finally, the last ones I referred to

11   were on December 26th, 2013.  She talks -- she again

12   makes one last pitch.  She's supposed to go back to the

13   embassy, and "They are very much interested in all the

14   videos with Sophia.  I'm going to give everything I have,

15   if you don't mind, of course", which is another attempt

16   to negotiate, to extort Valerio.

17          So I submit, Ms. Kalichenko, as she is sitting

18   here before your Honor is lying to this Court about her

19   motivation in coming forward to the FBI.  And she's lying

20   to this Court as she sits here today because she can't

21   admit she was trying to extort him for money because she

22   knows how awful that is, your Honor.  She was willing to

23   molest her infant daughter, 46 times for $12,000 over the

24   course of conduct.

25          And even when he wants to adopt a child, she's

63

Proceedings

1   willing to overlook all of that, if he's willing to pay

2   her money.  That's what's unconscionable in this case.

3         The government asks the -- the only reason the

4   government is requesting, I submit, a nonguideline

5   sentence, which will allow her to be released some day,

6   is in recognition of the assault by Mr. Valerio, which I

7   submit is not related to her conduct here, which is very

8   clear, was for money.  It was not a long distance,

9   psychological control.  That flatly ignores what's in

10  black and white in the text messages, where she is

11  taunting Valerio.

12        What we asked the Court to recognize is -- and

13  that's the reason why the government would request

14  anything than an effective life sentences in recognition

15  of that.  Your Honor should consider that Fatico

16  testimony, and you should consider the fact that she was

17  willing to provide that testimony as to Mr. Valerio.

18        But I submit very clear from these messages,

19  she didn't come forward to the FBI out of the goodness of

20  her heart.  She came forward as a ploy to get more money.

21        And we ask your Honor to protect children,

22  particularly Ms. Kalichenko's daughter from Ms.

23  Kalichenko.  Your Honor will recall in addition to -- and

24  I believe it's refrenced in the PSR, in addition to the

25  daughter -- Kalichenko was providing contact information

64

Proceedings

1   for a 15-year-old girl to do "modeling" for Valerio, at

2   this time when she knows he's a violent, sexual predator.

3           So I submit, her daughter is not safe from Ms.

4   Valerio if there is money to be made from her daughter

5   for a significant period of time.

6           So we're asking that your Honor sentence the

7   defendant to a sentence of 25 years which allow her

8   daughter to be an adult, to be able to protect herself

9   before Ms. Kalichenko is released.

10           Everything else, I think I said in my letter,

11   your Honor.  If your Honor has any questions, I'm happy

12   to answer but otherwise, I'll rest on my letter.  Thank

13   you.

14           THE COURT:  I just wanted to briefly -- the

15   government does not seek any restitution order in this

16   case, correct?

17           MR. BODE:  No, and I spoke with -- I haven't

18   spoken with Mr. Singer, but I did speak with Mr. LaRusso

19   about that.  The defendant, we except following the

20   conclusion of the case, will be deported to the Ukraine.

21   Anything, I think in terms of money, the little bit she

22   might make in the course of a prison job, you know, she's

23   sending money to her mother in any event, so I don't

24   think a restitution order would have any -- it wouldn't

25   do anything in this case, I submit.

65

Proceedings

1        And we also are -- you know, lacking in any

2   basis in terms of a -- what restitution would be a result

3   of this criminal conduct, if any.

4        THE COURT:  And then on the issue of the

5   conditions of supervised release, the special conditions,

6   assuming she were to stay in the United States, which I

7   don't believe is what is going to happen, but assuming

8   she did, she'd certainly should be under supervision.

9        I think these special conditions with respect

10  to -- that would relate to pornography or treatment for

11  sexual disorders, I don't think apply to her because I

12  don't think there's any evidence in the record that she

13  has any sexual interest in children.  The only evidence

14  in the record is she did this because of the money.

15       MR. BODE:  Yeah, I --

16       THE COURT:  So I don't think all those

17  conditions are appropriate.

18       MR. BODE:  And I don't have the conditions in

19  front of me, presumably there's mental health treatment

20  outside of sexual disorders.

21       THE COURT:  Yes, and the mental health

22  treatment is fine, but --

23       MR. BODE:  Yes, and if during that mental

24  health treatment, the provider indicates that they think

25  that she needs that, then the probation department can

Proceedings

1    bring a modification to your Honor and try and show your

2    Honor the basis for that, but I agree at this point, I

3    think that is appropriate.

4         THE COURT:  Yeah, and the association with the

5    underage children, I was going to limit, modify it, has

6    been done in other cases, because even though she doesn't

7    have a sexual interest, because of the conduct here, I do

8    think if she has someone under her care or someone who is

9    cohabitating, that there should be restrictions with

10   respect to that.  Agreed?

11        MR. BODE:  Yes.

12        THE COURT:  All right.  And Ms. Kalichenko,

13   before I sentence you, I'll allow you to briefly respond

14   to Mr. Bode.  I know there was something you wanted to

15   say.

16        Go ahead.

17        MR. SINGER:  Your Honor, I --

18        THE COURT:  Oh, Mr. Singer, go ahead.  You can

19   go first.

20        MR. SINGER:  If I could just note that the

21   communications between Ms. Kalichenko and Mr. Valerio

22   that were referenced by the government were in December

23   of 2013, and Ms. Kalichenko had met with, and provided

24   some evidence, if not every bit of it, but certainly some

25   evidence to the government in November of 2013.  So she

67

Proceedings

1    had already begun providing information to them before

2    these communications in December.

3            MR. BODE:  We agree, your Honor, and it's even

4    referenced in the text themselves.

5            THE COURT:  Yeah, I don't think his argument is

6    that she didn't provide any evidence.  I think his

7    argument is that she was withholding some of the evidence

8    in order to obtain money from him.  I think that's the

9    argument, not that she hadn't provided any evidence at

10   that point.

11           MR. SINGER:  Well, he didn't know the extent of

12   the information that -- I mean, Valerio did not know the

13   extent of anything that she had provided.

14           THE COURT:  I understand that.  Okay.

15           Go ahead, Ms. Kalichenko.

16           THE DEFENDANT:  Can I -- can I say something

17   about this?

18           THE COURT:  Yes.

19           THE DEFENDANT:  Yeah, well this -- you know,

20   with regards of the money, you know, there has been a lot

21   of the money issue talking about.  First of all, I want

22   to tell you that I do agree that I should -- should not

23   have done it for money, and I do agree that I should have

24   come up with another solution, as I said.  I'm not saying

25   this is a justification for the actions at all.

Proceedings

1        With regards to my situation, you know, at home

2    what I was facing, there is my mother's testimony.  So

3    they are making assumptions which totally contradict as

4    to what my mother has already said in terms of the

5    economic situation.  The amount of money that they have

6    specified 2012, or something like this, this is not even

7    relate -- that's not all the amount of money is not

8    related to the videos.

9        Valerio has been sending me the money when I

10   met him in June of, like 2011, when there was no videos

11   at all.  He was simply sending me money because I was in

12   a relationship with him with the purpose to marry.  He

13   has been sending me money for six months.  There was

14   absolutely nothing, no videos when my daughter was in the

15   orphanage, Valerio was sending me money.  And only with

16   the help of his money, I was being able to take her out

17   from the orphanage.  He was sending me money because it

18   was -- because we were in a relationship with him, but as

19   I said, I was still -- was dependent on his money at that

20   point, but still I said I should not do it, even for --

21   I'm not saying I should have -- I should have come up

22   with another, you know, source of money.  I'm not

23   justifying it.

24        But the amount of money they come up with is

25   not related to -- you should -- I think you should look

69

Proceedings

1    into my mother's testimony what she says when the video

2    took place, and what we were facing in my country.

3              So she provided very detailed description of

4    what has happened.  So what they say is simply

5    contradicts to what she says.  That she is a -- she is a

6    witness in my case.  She knew what was my family

7    situation.  She knew what we were facing.  She knew that

8    we just -- the first -- the first time he asked me for

9    the videos was six days after I took her from the

10   orphanage, six days after.

11             My mother testified what our situation.  She

12   testified what we were facing.  She said what would have

13   happened if it did not, you know, secure the premises for

14   us to live.  There was sort of a detailed testimony that

15   she provided for every single occasion, for every single

16   occasion.  Like if you want me to again go through the

17   testimony, I would like to do it but they said they

18   contradict what she says.  This is first of all.

19             With regards to the trips they mentioned it,

20   the trips took place in 2013.  This not Valerio's money.

21   What does it have to do with him?  It is not his money at

22   all.  This is a year after my relationship with Valerio

23   has terminated.  That -- that's not his money.

24             So Estonia, Europe, whatever, this is not --

25   what does it -- I don't even understand why they're even

Proceedings

1   discussing it.  This is not Valerio's money.  This is the

2   -- the money that I used to go to Europe, it's not

3   agreement of (indiscernible).  Why is it even the subject

4   of the conversation.  That was a money from a different

5   source completely unrelated to Mr. Valerio at all.  If I

6   need to justify the source of the money, I have a

7   financial documents that I'm willing to provide to court,

8   has nothing to do with -- with -- with the issue.

9        You know, and as I said, there is no evidence

10  for them to say that when I did have money, I did not

11  take care of my family.  That's not what my mother says.

12  That's not what Mr. Dicleli says.  He said that I -- that

13  I have money, he said it how I was taking care of my

14  daughter.  He said that out of the money that he was

15  giving me, I was buying -- buying stuff for his son.

16  This is what he says.

17       You know, but the fact with the December with

18  the conversation that the -- you know, that they pointed

19  out, I'm not -- I'm not denying that -- like for

20  instance, if you look into what I'm saying to -- my

21  message to Valerio on the 29th, "Joseph, I've also made

22  the decision to get a lawyer in the U.S., and sue you for

23  the abuse and moral damages towards me and Sophia,

24  regardless of any (indiscernible) with the

25  investigation."

71

Proceedings

1        So that -- I don't deny that I had an intention

2  to bring a lawsuit against him.  I even spoke with an

3  attorney in my country about, I don't deny it, but what

4  is -- that has -- I -- I -- for that's how I felt, and I

5  spoke to other people, that's what they told me I should

6  probably do, and I told him about it.  But it has nothing

7  to do about me providing the evidence.  This -- this

8  conversation with -- with me and Valerio took place,

9  first of all, that it was a person who witnessed my

10  conversation with him, but I didn't bring him up, you

11  know, because I was present in somebody's house when this

12  conversation, you know, took place.

13        But this -- I think it was already after I

14  provided all of the information to FBI.  There was --

15  after December, I don't think I provided any information

16  to them in December, whatsoever, at all.  Whatever I

17  provided, I provided in my meetings during November --

18  like in -- in -- and again, he offered me the money.  He

19  specifically offered me the money if I could have helped

20  him with adoption.  I did not have to extort him for

21  nothing because he offered me the money, but I rejected

22  his offer.

23        That's unclear to me, like -- so they think

24  that if I wanted to accept his money, he would -- like

25  this doesn't make no sense from the claim that they're

Transcriptions Plus II, Inc.

72

Proceedings

1   making.

2

3          MR. BODE:  Judge, Ms. Kalichenko just lied to

4   the Court again.  If you look at the pictures of her

5   world-wind, world tour, there's -- if you look at the

6   dates, they're dated; February 2013, February 2013, this

7   one is up into 20- -- April of 2013.  You could see the

8   backgrounds --

9          THE DEFENDANT:  Exactly.  This is --

10          MR. BODE:  The Eiffel Tower in --

11          THE DEFENDANT:  -- 2013.

12          MR. BODE:  -- April of '13.

13          THE DEFENDANT:  That's not Valerio's money.

14   What are you talking about?

15          MR. BODE:  She -- she said a moment ago, it was

16   2015.  She's again lying to the Court.

17          THE DEFENDANT:  It'S not Valerio's money, 2013.

18   Why don't you already check the evidence, that's not

19   Valerio's money.  And I do -- and as I said, I do have a

20   financial statement out of my bank account, which

21   testifies the source of the money.  I know that Mr.

22   LaRusso have the statement.  I don't know if Mr. Singer

23   has the -- the statement.

24          But, you know, my -- I terminated my

25   relationship with him in November of 2012.

73

Proceedings

1          THE COURT:  Yes.

2          THE DEFENDANT:  2013 has nothing to do with him

3     -- with Valerio at all, and it's not his money.  But

4     nevertheless, I still want to tell the Court that, you

5     know, I shouldn't have taken his money at all, I agree

6     about it.

7          THE COURT:  All right.  Thank you, Ms.

8     Kalichenko.  I am now going to state the sentence I

9     intend to impose.  I'll give the attorneys a final

10     opportunity to make a legal objection before I impose the

11     sentence.  In imposing the sentence, I have carefully

12     considered, as I am required to, the factors that are set

13     forth by Congress in Section 3553(a).  These factors

14     include, among others, I am not listing all of the

15     factors, although I am considering all the factors, the

16     nature and the circumstances of the offense, the history

17     and characteristics of Ms. Kalichenko, the need for the

18     sentence imposed to reflect the seriousness of the

19     offense, to promote respect for the law, and to provide a

20     just punishment for the offense, to afford adequate

21     deterrence to criminal conduct, to protect the public

22     from further crimes by the defendant.

23          I've also considered the advisory guidelines

24     issues by the sentencing commission, and the applicable

25     range in this case, as well as the applicable policy

74

Proceedings

1    statements issued by the sentencing commission.

2              Although I want to state with respect to that

3    factor, that my sentence would be the same regardless of

4    the guidelines calculation in this case.  The sentences

5    under the 3553(a) factors are independent of the

6    guidelines calculation.  The guidelines are not

7    motivating this sentence in any way.

8              The Court has considered, there's been a lot of

9    submissions about the need to avoid unwarranted

10   sentencing disparities among similarly situated

11   defendants.  I have certainly carefully considered that

12   factor, among all of the factors.

13             Having considered those factors, and all of the

14   3553(a) factors, it is my intention to impose a total

15   sentence of 20 years imprisonment.  I'm going to state

16   the reasons for that sentence, how I've arrived at it.

17             I've given the sentence much thought, and I

18   have to emphasize the horrific nature of the sexual

19   exploitation that occurred in this case of the

20   defendant's child, the age of two.  This is not just an

21   isolated act.  This was months of videos.  She abused her

22   child to make these videos for money.  That's the bottom

23   line.

24             It's exacerbated by the fact that she committed

25   the acts as the mother of this child.  As noted by the

75

Proceedings

1  government, her job is to protect her child, and instead

2  she made these videos. She sexually exploited her child,

3  made videos and sent them to the United States to a

4  sexual predator.

5          The seriousness of this conduct, the need to

6  protect the public, the need to promote respect for the

7  law, to send a message that this conduct, you know, will

8  be met with severe punishment, all of those things are

9  extremely important to be reflected in this sentence.

10          There are other factors, mitigating factors

11  that the Court has considered, and it's the reason why

12  I'm not imposing a higher sentence in this case.  But I

13  do want to go through them because I believe even some of

14  the mitigating factors are not as clear as Mr. Singer or

15  Ms. Kalichenko have suggested in their papers or today.

16          They are mitigating to some extent, but I don't

17  find them compelling to the degree that they find them on

18  balance -- especially on balance against the other

19  information before the Court.

20          First of all, I just want to emphasize that the

21  Court found, and I continue to find that she was sexually

22  assaulted by Mr. Valerio, treated in a demeaning way, and

23  he is a violent sexual predator.  There's no question

24  about that.  And the fact that she had to go through that

25  abuse is something that the Court is considering, and her

76

Proceedings

1  sentence is much lower because of that abuse.  The

2  paragraph -- I just want to note, the presentence report

3  noted in paragraph 74 that she did not report this

4  history of sexual abuse in her MDC evaluations but

5  notwithstanding that, again we had a hearing, I heard her

6  testimony.  I have no doubt in my mind that she was

7  credible on that, and that that sexual assault and

8  violence took place, and the overall treatment that she

9  was subjected to, psychological treatment of Mr. Valerio

10  was horrific, and the sentence is lower because of that.

11       But I do want to point out that it does not

12  explain her conduct in this case.  There are cases where

13  there are women who are in fear of someone who they have

14  an abusive relationship with, and do things because

15  they're in fear of their physical safety.

16       Ms. Kalichenko was in the Ukraine at the time

17  that she made these videos.  There was no physical factor

18  here where Mr. Valerio had some type of control over here

19  as a result of the physical abuse, or even the

20  psychological abuse that she had endured while she was in

21  the United States.  This was for money.

22       Now I have considered her mother's evidence,

23  Ms. Kalichenko's evidence, regarding the circusmtances

24  with her child, and itis a factor, andthe Court has

25  considered that.  And again, the sentence reflects that

77

Proceedings

1    factor, but she had the child.  At the time she made

2    these videos, the child was out of the orphanage, and I

3    understand she wrote in great detail that there were --

4    she was concerned that if she did not have sufficient

5    money, the child would be returned to the orphanage, but

6    as the government points out, this was an enormous amount

7    of money in terms of being able to avoid her child going

8    back into the orphanage.  This is over $12,000.

9          In paragraph 64, her mother notes that her

10   total expenses in the Ukraine is $536 per month including

11   rent.  So the idea that she needed to -- and I understand

12   that all that money wasn't for the videos, that he had

13   sent her other money based upon their own relationship,

14   but the argument that she needed to make these videos in

15   order to avoid her child going back into the orphanage, I

16   don't believe is as compelling as she has argued to the

17   Court.

18         And although it is a factor, it is not as

19   compelling as she is suggesting to the Court.  And in any

20   event, even if she needed the money to avoid her daughter

21   going to an orphanage, it does not excuse subjecting her

22   daughter to months, and months of sexual abuse, making

23   videos, and sending them to the United States, and she

24   has repeated that numerous times, and I think understands

25   that.

78

Proceedings

1    The Court has considered the cooperation, and
2    again I significantly reduced her sentence because she
3    did cooperate with the government, although the
4    government didn't make a motion on her behalf, the Court
5    is allowed to in its discretion.  I have considered that
6    cooperation.

7    She did, as a result, and I'll get into the
8    issue regarding motives in a moment, but the bottom line
9    is as a result of her coming forward, Mr. Valerio was
10   arrested, a search warrant was conducted.  She was
11   willing to come to the United States and testify against
12   him, and I think the sentence should reflect that
13   cooperation independent of the government's arguments
14   with respect to her motives.

15   So I have lowered the sentence from what I
16   would otherwise would impose because of the cooperation
17   that she did provide.  However, I do believe that there
18   were mixed motives with respect to this, and that's
19   reflected in the record, as I noted to her, and
20   regardless of what her situation was when she was in a
21   relationship with Mr. Valerio, but by her own accounts,
22   on page 9 of her letter to Mr. Yami (ph.), and elsewhere,
23   she says in October of 2012, she left that toxic
24   relationship, and began dating another individual.

25   Notwithstanding that, at that point, she knew

Proceedings

1   there was a dangerous, sexual predator in the United

2   States, which she had -- who had requested and who she

3   had sent videos of her child, and notwithstanding the

4   danger that he obviously posed to other women, to

5   children, she -- when she was out of that relationship,

6   didn't need Mr. Valerio in any way, was not under his

7   psychological control at all, she did nothing.  She did

8   nothing for many months.  And it was only upon receiving

9   an email from him regarding adoption that apparently

10  after consultation with her boyfriend, she decided to

11  come forward because she did not want that to happen.

12        I accept that she came forward because she

13  received that email.  The timing obviously shows that.

14  The nature of the email shows that but that does not

15  eliminate what Mr. Bode is arguing, which is that she

16  also, at that time, had other motives, while not wanting

17  to be able to adopt the child from the Ukraine, and while

18  giving some information to the FBI, she was clearly at

19  that time, trying to use her ability to give additional

20  videos and evidence to the FBI to obtain money from him,

21  and she obviously there's no dispute that she sent those

22  text messages at the hearing, the Fatico hearing.  Page

23  152, she acknowledged that.

24        She obviously has a different interpretation of

25  them, and the government -- the issue of whether or not

Proceedings

1    through a lawsuit or other means, she could get

2    compensation from Mr. Valerio, does not explain the

3    nature -- in other words, if she had sent texts to him

4    saying I'm going to sue you unless you compensate me for

5    what you put me through, that would be a different text

6    messages than -- or messages that she sent him where she

7    was saying that she would withhold additional videos from

8    the FBI if he paid her money.

9         It's not clear to me that if he had, in fact,

10   paid her money, that she would've continued cooperating

11   with the FBI, based upon my involvement in this case from

12   day one, and my review of the evidence, and the -- of

13   what I've heard.

14        I also want to note that as Mr. Bode noted, and

15   this is in a paragraph of the pre-sentence report, 11,

16   that she gave Mr. Valerio contact information for three

17   other individuals, including a 15-year-old, and at

18   paragraph 27, she told the probation department that she

19   was warning these girls, and said that the father of one

20   of the girls was going to be present.  When Mr. Valerio

21   spoke to that girl, she didn't have the ability to travel

22   to the United States but again, this just undermines some

23   of these mitigating factors that she's pointing to about

24   what she was doing, and why she was doing it.

25        The idea that she would give to someone who had

Proceedings

1   raped her, who had asked her to make these videos, was

2   clearly a danger to women and children, to give him

3   contact information for other women, and jeopardize them,

4   regardless of whatever warning she was giving them, she

5   didn't know how that was going to play out, what he would

6   offer them, what they might do in response to any offers

7   that he made, just shows that her motivations here, and

8   her thinking were not exactly as she's suggesting to the

9   Court.

10          So that is why I believe, although there are

11   number of mitigating factors, they are not as compelling

12   as is been articulated here by Mr. Singer, and Ms.

13   Kalichenko.  But I do want to emphasize that

14   notwithstanding the things that I've pointed to, she

15   would be getting a much higher sentence in this case.

16          And I also want to note this issue regarding

17   proportionality, I did a survey of other cases involving

18   the production of child pornography, and the sentences

19   that are imposed for individuals involved in this are

20   much higher than in 20 years.  They're -- and I'm not

21   going to go through the cases that I looked at, in

22   (indiscernible) there's a case called Ketcham (ph.), an

23   Eighth Circuit case called Lenke (ph.), 30 years, a case

24   called Chase in the Second Circuit, 50 years, a case

25   called Freeman (ph.) in the Seventh Circuit, 360 months.

82

Proceedings

1          So this type of conduct, people who are engaged

2     in producing child pornography, I understand those cases

3     are not exactly the same as the one we have here, get

4     very high sentences.  So the idea that this is somehow

5     disproportionately high is not my belief.

6               I would also note the case -- I can't -- a lot

7     of these cases, because they're sealed, it's hard for me

8     to see exactly all of the facts but this Norton, for

9     example, which was a lot of briefing was done on her, is

10    not similarly situated, Ms. Kalichenko.  It was a one-

11    week period.  It involved simulated sexual act.  It

12    wasn't for money.  So I don't believe that that is a

13    similarly situated defendant.

14              I will note, I did find two cases that I think

15    are -- again, there's no case exactly like this but

16    similar, a case called United States v. Brooks.  This is

17    an Eighth Circuit case from 2019, March 6th, where Ms.

18    Brooks got 240 months.  She met an individual over the

19    internet, and sent nude pictures of her infant daughter,

20    and conducted video chats with this individual that

21    involved her daughter.  And she argued that she should

22    get the 15-year mandatory minimum only.  She was a first

23    time offender, had a low IQ of 71, had various mental

24    health, and psychological issues, particular a dependent

25    personality disorder, making her likely to be submissive

Proceedings

1   and steered against her better judgment in relationships,

2   and in that case, she received a 20-year sentence.

3         And then finally, United States v. Comeaux.

4   This is a Fifth Circuit case from 2010 where a man made

5   pornographic videotape of his four-year-old foster

6   daughter using a camera he had hidden in her bathroom,

7   and he received a 240-month sentence.

8         So this is not a disproportionate sentence,

9   even when considering the issues regarding her

10   cooperation, and the other things that the Court has

11   pointed to.  But the bottom line is the sentence would be

12   much higher but for my consideration of the fact that he

13   raped her, and subjected her to, you know, degrading and

14   inhumane treatment over the course of the relationship,

15   and it's also reflecting her cooperation, and the overall

16   circumstances that I've discussed.

17         So that's how I arrived at the sentence.  As I

18   noted, it would be the same regardless of the guidelines

19   calculation.  I know the government, and the probation

20   department were recommending 25 years here.  I don't

21   think that would properly reflect the cooperation that

22   she did provide, regardless of the motives, as well as

23   the abuse that she suffered at the hands of Mr. Valerio,

24   although I agree with Mr. Bode, that that -- it's not

25   linked to what she did here, but it still should be

84

Proceedings

1   reflected in the sentence in my view, to this extent.

2           I obviously know I could impose the 15-year

3   mandatory minimum here, but I don't believe that that

4   sentence would properly reflect what she did, the harm

5   that was caused, the need to protect the public,

6   including her daughter, and the need to send a general

7   deterrence message as to the severity of the sentence for

8   this type of conduct, especially by a mother over an

9   extended period of time, regardless of the financial

10  issues that she faced.

11          Obviously, Ms. Kalichenko could face the same

12  type of economic circumstances when she went back to the

13  Ukraine, and the Court is certainly concerned, as to how

14  she would react if faced with similar circumstances,

15  although I do accept her remorse.  I've been presiding

16  over this case, you know, for five years, and certainly

17  her remorse -- at the time of her guilty plea, she pled

18  guilty, I didn't sense any remorse at that point.  There

19  was overwhelming evidence of guilt that I think prompted

20  her to plead guilty, but certainly over time, I do

21  believe that she understands what she did was wrong, and

22  is remorseful for that conduct.

23          So again, I have calculated that in here, as

24  well, notwithstanding the government's arguments.  I am

25  giving her credit for her acceptance of responsibility,

85

Proceedings

1   and the remorse that she expressed in writing, and to

2   this Court.

3           So that's how I arrived at the sentence.  I

4   intend to impose 20 years on each count, all to run

5   concurrently with each other, for a total sentence of 20

6   years.  I intend to impose five years of supervised

7   release on each count, which obviously all run

8   concurrently by operation of law.

9           I intend to impose the special conditions that

10  are in the recommendation, the second one regarding sex

11  offender registration, the mental health -- number,

12  three, the mental health treatment without the one for

13  sexual disorders.  The association provision, I'm going

14  to modify to be more narrow to cover people who should

15  would potentially have routine contact with.  I believe

16  that given her conduct here, anyone who is placing a

17  child in her routine contact or care should be -- the

18  probation department should be aware of that, and also if

19  she co-habitats with anyone with such a child, they

20  should know of what happened in this case, so they can

21  evaluate that.

22          But the other ones regarding viewing

23  pornography or monitoring her computer, notifying her

24  employer, I don't think any of those restrictions are

25  warranted because I don't believe that there's any

Proceedings

1  evidence that she has any type of sexual order --

2  disorder, or any type of attraction to children, sexual

3  attraction to children.

4           Again, I am going to impose that she not

5  possess a firearm, ammunition or destructive device.

6  That if she is deported, she will not be able to reenter

7  the United States, and she'll comply with immigration

8  officials, and I believe that the search conditions

9  should be imposed because again, the use of the

10 electronic devices to facilitate the criminal offense

11 here, if she does stay in the United States, certainly

12 the probation department should have the ability to

13 search her house, and her computers, or electronic

14 communications to see whether or not any type of similar

15 conduct, as occurred in this case is reoccurring.

16          I intend to impose a $100 special assessment on

17 each count, for a total of $500.  I intend to impose no

18 fine because she doesn't have any money to pay a fine,

19 and I'm not going to impose restitution for the reasons

20 that Mr. Bode indicated.

21          And obviously, the set standard and the

22 mandatory conditions of supervised release will be

23 imposed.  And I'm noting, obviously as I said, I expect

24 her to be deported when she completes the sentence, but

25 to the extent that she was able to stay in the United

87

Proceedings

1   States, she certainly should be under supervision with

2   these types of conditions, so the Court can make sure

3   that she does not return to the similar -- to any

4   criminal activity or to this type of criminal activity.

5        Is there any legal reason why the Court cannot

6   impose that sentence, Mr. Bode?

7        MR. BODE:  Two things, Judge, we dismissed

8   Count 2, so that should be $400, not $500.

9        THE COURT:  Yes, thank you.

10        MR. BODE:  And in terms of all the other

11   conditions, I didn't have any objection.  In terms of

12   computer monitoring though, I would ask that there be

13   computer monitoring because she specifically met Mr.

14   Valerio via computer.  She was sending him items via

15   computer.  She was sending him items via computer, and

16   she was in communication with him via computer devices.

17        So I think, you know, a cell phone is computer.

18   I think computer monitoring is appropriate --

19        THE COURT:  Yeah.

20        MR. BODE:  -- given her history.

21        THE COURT:  I don't think -- I think, and

22   there's balancing, the computer monitoring in these types

23   of cases is usually because you're concerned that the

24   person is accessing child pornography.  Again, I'm don't

25   have that concern here, and I understand what you're

Proceedings

1   saying but I think having the ability to search her

2   computers at any computers at any time is sufficient to

3   ensure that she's not engaging in this type of

4   communication with anyone, rather than an ongoing

5   monitoring.

6             MR. BODE:  That's fine, Judge.

7             THE COURT:  Okay.

8             MR. BODE:  Thank you.

9             THE COURT:  All right.  Mr. Singer, is there

10   any legal reason why the Court cannot impose that

11   sentence?

12             MR. SINGER:  No, your Honor.

13             THE COURT:  All right.  I'm going to now

14   pronounce the sentence.  Ms. Kalichenko, it is the

15   judgment of this Court in its discretion that you be

16   sentenced to the custody of the Attorney General through

17   the Bureau of Prisons to a total term of imprisonment of

18   240 month, 20 years, consisting of a 20-year sentence on

19   Counts 1, 3, 4, and 5, all to run concurrently to each

20   other.

21             I impose a five-year term of supervised release

22   on each count, which will run concurrently by operation

23   of law.

24             I impose the mandatory conditions, the standard

25   conditions, and the following special conditions:

89

Proceedings

1           (1) You shall comply with any applicable state

2    and/or federal sex offender registration requirements, as

3    instructed by the probation officer, the Bureau of

4    Prisons, or any state offender registration agency, and

5    the state where you reside, work, or a student.

6           (2) You shall participate in a mental health

7    treatment program as approved by the probation

8    department.  You shall contribute to the cost of such

9    services rendered, and/or any psychotropic medications

10   prescribed to the degree you're reasonably able, and

11   you're to cooperate in securing any third-party payment.

12   You shall disclose all financial information and

13   documents to the probation department to assess your

14   ability to pay, as part of -- and I note that this is

15   warranted based upon the issues I've gone over in this

16   case.  I think she was asking for mental health treatment

17   in the jail.  There were issues with her wanting to go on

18   a hunger strike at some point.  So I think she would

19   benefit from continuing mental health treatment, but not

20   sex offender treatment, unless somewhere it would

21   indicate during the mental health treatment that that

22   were necessary.

23           (3) You shall not associate with children under

24   the age of 18, unless a responsible adult is present, and

25   you have the prior approval from the probation

90

Proceedings

1   department.  Prior approval does not apply to contacts

2   which are not known in advance by the defendant, where

3   children are accompanied by a parent or guardian, or for

4   incidental contacts in a public setting.  Any such

5   nonapproved -- pre-approved contacts with children must

6   be reported to the probation department within 18-hours

7   following the contact.

8           Upon commencing supervised release, you shall

9   provide to the probation department, the identity and

10  contact information regarding any family members, or

11  friends with children under the age of 18, with whom you

12  expect to have routine contact with, so that the parents

13  or guardians of these children may be contacted, and the

14  probation department can approve routine family, and

15  social interactions, such as holidays, and other family

16  gatherings, where such children are present, and

17  supervised by parents or guardians without individual

18  prior approval of each event.

19          Next, if you co-habitat with an individual who

20  has minor children, you will inform that other party of

21  your prior criminal history concerning the sex offense.

22  Moreover, you will notify the party of the prohibition I

23  just imposed of associating with any children under the

24  age of 18, unless a responsible adult is present under

25  the conditions that I've described.

Proceedings

1          Next, you shall not possess a firearm,

2    ammunition or destructive device.

3          The next special condition, if deported, you

4    shall not illegally re-enter the United States.  You

5    shall comply with immigration officials, and finally, you

6    shall submit your person, property, house, residence,

7    vehicles, papers, computers, as defined in 18 USC Section

8    1030(e)(1), other electronic communications, or data

9    storage devices, or media, or office, to a search

10   conducted by a United States Probation Officer.  Failure

11   to submit to a search can be grounds for revocation of

12   release.

13         You shall warn any other occupants that the

14   premises may be subject to searches pursuant to this

15   condition, and offers to may conduct a search pursuant to

16   this condition, only reasonable suspicion exists that you

17   violated a condition of your supervision, and that the

18   areas to be searched contained evidence of this

19   violation.  Any search must be conducted at a reasonable

20   time, and a reasonable manner.

21         I impose a $100 special assessment on each of

22   the four counts that remain, for a total of $400, and I

23   impose no fine.  I impose no restitution.

24         Ms. Kalichenko, I'm advising you of your right

25   to appeal the conviction and sentence.  If you don't have

92

Proceedings

1  the money to pay the cost of appeal, you may apply for

2  leave to appeal in forma pauperis.  If you cannot afford

3  an attorney on appeal, one will be appointed to represent

4  you.  The notice of appeal must be filed within fourteen

5  days of the judgment of conviction.

6          Do you want me to make any recommendation

7  regarding the facility that she should be designated to,

8  Mr. Singer, or just leave it up to the Bureau of Prisons?

9          THE DEFENDANT:  Yeah, I already indicated that

10  I intend to enforce the treaty.

11          THE COURT:  You intend to?

12          THE DEFENDANT:  Enforce the treaty.

13          MR. SINGER:  Judge, Ms. Kalichenko is going to

14  seek relief under a treaty, a bilateral treaty.

15          THE COURT:  Yeah, that --

16          MR. SINGER:  I'm not sure if it's bilateral or

17  if it's a multilateral treaty that involves both the

18  United States and the Ukraine, that would -- that could

19  permit her to serve her sentence in the Ukraine.

20          THE DEFENDANT:  They already asked me five

21  times, if I --

22          THE COURT:  Okay.

23          THE DEFENDANT:  -- if I want to apply to --

24          THE COURT:  But --

25          MR. SINGER:  You can --

93

Proceedings

1      THE COURT:  You can make that application.  I

2  have nothing to do with that application, but in the

3  event that it is unsuccessful, I can recommend that you

4  be designated to a region, to a facility, so --

5      THE DEFENDANT:  Yeah, I want to be close to my

6  family, that's why I want -- there is no point for me to

7  recommend anything in the United States.

8      THE COURT:  Okay.

9      THE DEFENDANT:  I have nobody in the United

10  States.

11      THE COURT:  That's fine.  I understand that.

12      THE DEFENDANT:  They said the purpose for this

13  is to be closer to your family, right?  But I have nobody

14  in the States --

15      THE COURT:  Not always.  Sometimes people,

16  because there's certain programs in certain facilities,

17  it usually is to be close to the family, but sometimes

18  they have done some research on certain facilities and

19  believe that the programs there are better for them, but

20  that's fine.

21      MR. SINGER:  Judge, there's no specific

22  request.

23      THE COURT:  All right, thank you.  All right,

24  anything else?

25      MR. BODE:  No, Judge.

94

Proceedings

1        THE COURT:  Anything else?

2        MR. SINGER:  No, your Honor.

3        THE COURT:  All right.  Thank you.

4            (Matter concluded)

5                -o0o-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **27th** day of **September**, 2019.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.